**COMMITTEE ON PROFESSIONAL ETH-
ICS AND CONDUCT OF THE IOWA
STATE BAR ASSOCIATION, Complain-
ant,**

v.

**John W. CARTY, Respondent.**

No. 94–60.

Supreme Court of Iowa.

April 20, 1994.

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

Peter S. Cannon of Connolly, O'Malley, Lillis, Hansen & Olson, Des Moines, and Patricia Carty, Cedar Falls, for respondent.

Considered by McGIVERIN, C.J., and LARSON, LAVORATO, NEUMAN, and ANDREASEN, JJ.

ANDREASEN, Justice.

John W. Carty is charged with a conflict of interest in a series of transactions with his clients, Brad and Ron Venghaus and their corporation, Venghaus Brothers, Inc. Following a hearing on the complaint filed by the Committee on Professional Ethics and Conduct of the Iowa State Bar Association (committee), a division of the Grievance Commission (commission) found Carty had violated DR 5–104(A), EC 5–1, and EC 5–3 of the Iowa Code of Professional Responsibility for Lawyers. It was the unanimous decision of the commission that Carty be reprimanded. No appeal was taken from the commission's report. Both Carty and the committee filed statements in support of and in resistance to the recommended sanction.

"When no appeal is taken from the commission's decision, we review de novo the record made before the commission and determine the matter." *Committee on Professional Ethics & Conduct v. Trujillo*, 479 N.W.2d 326, 327 (Iowa 1992). Upon review we may impose a lesser or greater sanction than the discipline recommended by the commission. Iowa Sup.Ct.R. 118.10. Although we are not bound by the findings and recommendations of the commission, we give respectful consideration to them. *Committee*

*on Professional Ethics & Conduct v. Morris,* 505 N.W.2d 194, 194 (Iowa 1993). Having reviewed the record we agree with the findings and recommendation of the commission.

I. Attorney Carty has maintained a law practice in Winfield, Iowa since 1952. He provided legal services to Ralph and Ruth Venghaus and their sons, Brad and Ron. The complaints against Carty arise from the legal services provided to Brad and Ron and to their corporation over a twelve-year period beginning in 1979. The complaints are based on a like-kind exchange of real property, a reassignment of the property, and post-reassignment representations.

A. In 1979 Brad, age twenty-three, and Ron, age twenty-five, offered to purchase a 160 acre farm from Kenneth and Myna Crile. The brothers asked Carty to form a corporation, Venghaus Brothers, Inc., to be the purchaser. The corporation was established and it purchased the Crile farm on contract for a purchase price of $280,000. Under the contract the corporation made a $66,000 down payment with the balance of $214,000 to be paid by annual principal payments and semi-annual interest payments. The contract provided Ron and Brad were personally liable to the extent that the debt exceeded $186,000. Brad and Ron borrowed $20,000 from their mother and sold a tract of land to secure the money required for the down payment. A few months after the purchase the Venghaus brothers decided they needed to get out from under the obligation. Their attempts to make a private sale were not successful.

During this same period Carty planned to sell at public auction a forty-three-acre tract of land in Virginia that he had inherited. He was aware the Venghaus brothers were trying to sell the Crile property. He proposed a like-kind exchange of his Virginia land for the Crile contract. If they agreed to the exchange, he agreed to lease the Crile land to the Venghaus brothers on a crop share basis. The exchange would allow the Venghaus brothers to recover their investment in the property and to pay back their mother's loan. Under the agreement the Crile contract would be assigned to Carty in exchange for his conveyance of the Virginia land. The assignment would be a tax-free exchange for income tax purposes. Also, Carty agreed to set aside $28,000 to guarantee the contract would be paid down to extinguish the personal liability of Brad and Ron under the Crile contract and to hold harmless the corporation from any claims for failure to perform under the contract.

Carty advised the Venghaus brothers that they should have another attorney review the proposed agreement. Instead they consulted with a certified public accountant regarding the exchange. The like-kind exchange agreement was completed in May of 1979. After completion of the sale of the Virginia property, the corporation assigned the Crile contract in August of 1982 to Carty in compliance with the like-kind exchange agreement. For several years Carty made the required payments on interest and principal including the payments due on March 1, 1985. The unpaid balance on the Crile contract was then $184,000. Although Carty was current on his payments on March 1, he recognized farm values had dropped dramatically and he attempted to negotiate with Criles a modification of the contract that would extend and reduce the payments.

B. In the spring of 1985 a farm known as the Fricke farm, located within one mile of the Venghaus farm, was listed for sale. Brad suggested the realtor contact Carty about the Fricke farm. After the realtor contacted him, Carty told Brad that if the brothers wanted to farm the Fricke farm instead of the Crile farm, he would be interested in purchasing the Fricke land provided he could reassign the Crile contract to the corporation.

Carty recognized a conflict of interest existed with regard to the proposed reassignment and he suggested Brad contact another attorney, Elmer Jones. Jones was familiar with the corporation, its financial situation, and he had provided services to Venghauses in the past. Jones was also a long-time friend of Carty.

A meeting was set for discussion of the proposed reassignment. Brad and Jones were present at the meeting in Carty's office on the 28th of June. Both attorneys gave Brad advice about the proposal. Brad was

advised the reassignment would release Carty from his agreement to hold harmless the corporation and that the corporation would again be solely liable for the Crile contract payments. Because the debt level had fallen below $186,000, Brad and Ron were no longer personally liable in the event of default on the contract payments. Jones suggested that in the event of default, the Criles would most likely take the land back in a forfeiture action rather than pursue an action against the insolvent corporation. The semiannual interest payment of approximately $7320 was due on September 1, 1985. Brad agreed to the proposed reassignment and Carty proceeded with the purchase of the Fricke farm. On August 9 the Crile contract was reassigned to the corporation with Carty reserving the 1985 crop. The reassignment agreement was signed by Carty, the corporation, and Brad and Ron individually. Carty also notified the Criles of the reassignment of the contract to the corporation.

C. The corporation did not make the September 1, 1985 payment on the Crile contract. Carty, on behalf of the corporation, contacted Criles and encouraged them to simply accept the reconveyance of the land because of the indebtedness of the corporation. The Criles rejected this proposal.

Rather than forfeit the contract, the Criles brought suit in 1986 against the corporation, Brad and Ron Venghaus, and Carty. Carty suggested to Brad that they hire Jones to represent them. Jones agreed to act as their counsel, and Brad and Carty agreed they would each pay one-half of the attorney's fees. The parties reached a settlement whereby the corporation surrendered its interest in the Crile farm, the Criles were paid $29,000, and the lawsuit was dismissed. Brad and Carty each paid one-half of the settlement amount and one-half of the legal fees. The settlement was made at Brad's insistence and contrary to the recommendation of Jones.

The relationship between the Venghaus brothers and Carty deteriorated in 1991. Brad and Carty had a landlord-tenant dispute as to expenses relating to the Fricke farm. In December of 1991 Brad filed a complaint against Carty with the Iowa State Bar Association.

Following an investigation of the complaint, the committee filed and prosecuted the complaint before the commission. Although the commission found no ethical violations with regard to the like-kind exchange in 1979, it found Carty violated a disciplinary rule and two ethical considerations with respect to the reassignment of the land contract in 1985. It also found Carty should have required separate counsel for the defense of the Crile litigation.

■ II. We may revoke or suspend the license of an attorney upon conviction of a felony, conviction of a misdemeanor involving moral turpitude, violation of any provision of the Iowa Code of Professional Responsibility for Lawyers, or any cause provided by statute or court rules. Iowa Sup.Ct.R. 118.10. We adopted an Iowa Code of Professional Responsibility modeled after the American Bar Association (ABA) Code of Professional Responsibility and incorporated it in Iowa Supreme Court rule 119 in October 1971. The original Iowa Code of Professional Responsibility did not include the preamble or preliminary statement adopted by the ABA. Contrary to the ABA preliminary statement that ethical considerations were aspirational in character, we stated "[i]n Iowa the ethical considerations do more than illuminate the disciplinary rules; in this jurisdiction a violation of an ethical consideration alone is sufficient to support discipline." *Committee on Professional Ethics & Conduct v. Patterson,* 369 N.W.2d 798, 800 (Iowa 1985). We recently revised the Iowa Code of Professional Responsibility and adopted a preamble and preliminary statement modeled after the ABA Code.

The amended preliminary statement (effective April 1, 1994) provides in the first paragraph:

In furtherance of the principles stated in the preamble, this Code of Professional Responsibility consists of three separate but interrelated parts: Canons, Ethical Considerations, and Disciplinary Rules. The Code is designed to serve as both an inspirational guide to the members of the profession and as a basis for disciplinary

action when the conduct of a lawyer falls below the required minimum standard stated in the Disciplinary Rules.

The preliminary statement further provides in part:

The Ethical Considerations are aspirational in character and represent the objectives toward which every member of the profession should strive. They constitute a body of principles upon which the lawyer can rely for guidance in many specific situations.

The Disciplinary Rules, unlike the Ethical Considerations, are mandatory in character. The Disciplinary Rules state the minimum level of conduct below which no lawyer can fall without being subject to disciplinary action.... The Code makes no attempt to prescribe either disciplinary procedures or penalties for violation of a Disciplinary Rule, nor does it undertake to define standards for civil liability of lawyers for professional conduct. The severity of judgment against one found guilty of violating a Disciplinary Rule should be determined by the character of the offense and the attendant circumstances. An enforcing agency, applying the Disciplinary Rules, may find interpretive guidance in the basic principles embodied in the Canons and in the objectives reflected in the Ethical Considerations.

By adopting these changes we have joined other states that follow the ABA Code. Although the ethical considerations will continue to illuminate the disciplinary rules, they will no longer support disciplinary action in Iowa.

Here we are concerned with only DR 5–104(A) which provides:

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

To illuminate this rule, EC 5–1 provides that the professional judgment of a lawyer should be exercised solely for the benefit of the client. EC 5–3 cautions a lawyer that the self-interest of a lawyer resulting from property ownership may interfere with the lawyer's judgment on behalf of a client.

Thus, DR 5–104(A) requires "in the absence of client consent after full disclosure, a lawyer cannot represent a client whose business interests conflict with the lawyer's own." *Committee on Professional Ethics & Conduct v. Oehler,* 350 N.W.2d 195, 198 (Iowa 1984). This rule "contemplates an attorney-client relationship exists at the time the transaction takes place." *Committee on Professional Ethics & Conduct v. McCullough,* 465 N.W.2d 878, 884 (Iowa 1991). The rule protects persons "who regularly rely on an attorney for legal services which arise on an occasional and on-going basis." *Committee on Professional Ethics & Conduct v. Postma,* 430 N.W.2d 387, 392 (Iowa 1988). Carty did have an attorney-client relationship with Venghauses at the time of the reassignment of the Crile contract. As shown by his billing records, he also acted as attorney for the corporation.

To establish that Carty violated this rule it was necessary to show that his interest and the client's interest differed in the transaction, that his client expected him to exercise his professional judgment for the client's protection, and that the client consented to the transaction without full disclosure. *See Committee on Professional Ethics & Conduct v. Mershon,* 316 N.W.2d 895, 898 (Iowa 1982). Full disclosure means more than making the client aware of the nature and terms of the transaction. *Id.* at 899. It requires the attorney to give a client the kind of advice the client would have received if the transaction were with a stranger. *Id.*

By reassigning the Crile contract to the corporation Carty was attempting to absolve himself from further liability under the contract. When the property was first assigned to him he agreed to make the contract payments and to hold the corporation harmless. His interest in the transaction was clearly contrary to that of the Venghauses.

Carty failed to make full disclosure to Brad of all material facts. There was no discussion of the current market value of the land compared with the unpaid balance, assignment of accrued interest, or the ability of

the corporation to make the contract payments. At the time of the reassignment, the unpaid balance on the contract was $184,000 with the semiannual payment of interest due the following month. The fair market value of the land was estimated at approximately $500 per acre for a total value of $80,000 at the time of the reassignment.

Further, Brad's employment of Jones and his meeting with him and Carty did not meet the standard of independent counsel. This was the only meeting Brad had with Jones regarding the reassignment. Carty sat in on the entire meeting and expressed his opinions along with those expressed by Jones. *See Committee on Professional Ethics & Conduct v. Hall,* 463 N.W.2d 30, 34 (Iowa 1990). Carty should have insisted that Brad secure independent counsel to advise them upon the legal consequences of the reassignment.

Likewise, after Crile commenced suit against Carty and Venghauses, Carty should have secured independent counsel or should have insisted that Brad secure independent representation with respect to the Crile litigation.

III. The commission considered several factors in recommending a public reprimand. They found the delay in filing the complaint had deprived Carty of the testimony of witnesses who were deceased at the time of hearing. The commission considered it significant that the Venghauses and Carty had maintained a professional relationship over a twelve-year period and that it was only after a dispute arose over expenses that the complaint was made. The commission found the testimony of Carty to be very credible and the testimony of Brad not credible. Carty practiced law since 1952 and no prior complaints had been filed against him.

Carty suggests that his deference to his client's wishes for settlement of the Crile litigation should be considered a mitigating factor. In paying one-half of the settlement, he subordinated his personal interest to that of Venghauses.

The committee suggests a reprimand of an attorney who has transferred substantial liability from himself to his client would not deter other lawyers from similar self-serving conduct. The committee also urges the failure of the client to complain should not be considered a mitigating circumstance. Nor is the delay relevant to the misconduct that occurred in 1985 and 1986. The witnesses who were deceased at the time of the hearing were not involved in the reassignment and civil lawsuit.

We find the hearing before the commission was very thorough. Both Carty and the committee ably presented their evidence and arguments to the commission. The commission expressly found that suspension of Carty's license was not warranted. When considering the character of the offense involved in this case and the attending circumstances, we believe the sanction of a public reprimand is appropriate. We have followed the commission's recommendation under similar circumstances in the recent case of *Committee on Professional Ethics & Conduct v. Qualley,* 487 N.W.2d 327, 329 (Iowa 1992), where an attorney, acting for both himself and his client, conceptualized and drafted legal instruments for the apparent mutual benefit of both the attorney and his client.

The costs are assessed against Carty as provided by Iowa Supreme Court rule 118.22.

**ATTORNEY REPRIMANDED.**