# IN THE SUPREME COURT OF IOWA

No. 14 / 07-1701

Filed February 22, 2008

**IOWA SUPREME COURT ATTORNEY
DISCIPLINARY BOARD,**

      Appellee,

vs.

**EDWARD L. WINTROUB,**

      Appellant.

On review of the report of the Grievance Commission.

Iowa Supreme Court Grievance Commission recommends a two-year suspension of the respondent's license to practice law to run concurrently with a previous suspension. **ATTORNEY REPRIMANDED.**

Waldine H. Olson, Omaha, Nebraska, and David A. Richter, Council Bluffs, for appellant.

Charles L. Harrington and Wendell J. Harms, Des Moines, for appellee.

**APPEL**, **Justice**.

In this case, we consider the sanctions recommended by the Iowa Supreme Court Grievance Commission (Commission) against a previously suspended Iowa lawyer who allegedly engaged in improper business transactions with a client, neglected a client matter, and improperly retained an unearned fee. For the reasons expressed below, we reprimand the lawyer for his misconduct, but impose no further sanction in addition to his previously imposed two-year suspension.

**I. Background Facts and Prior Proceedings.**

**A. Introduction.** Edward J. Wintroub is a lawyer whose Iowa license was suspended in 2004 through reciprocal discipline after his Nebraska license was suspended by that state's supreme court. In the Nebraska matter, Wintroub was found to have committed a series of transgressions including misappropriating client funds and comingling personal funds with those of his clients. Wintroub denied the allegations, asserted affirmative defenses of laches and estoppel, and further suggested that at all relevant times he was taking medications prescribed by physicians for a variety of medical conditions. Wintroub alleged that the known side effects of such medications included confusion, decreased concentration, decreased mental clarity, impaired memory, temporary memory loss, sleep disturbances, slurred speech, and seizures.

The Nebraska Supreme Court suspended Wintroub's license for two years, placed him on an additional two-year term of probation, and imposed a number of additional conditions upon his reinstatement. *State ex rel. Counsel for Discipline, Nebraska Supreme Ct. v. Wintroub*, 678 N.W.2d 103 (Neb. 2004). Pursuant to our rules, we imposed a two-

year suspension on Wintroub's Iowa license as a result of the Nebraska decision.

**B. Allegations of the Board.** In May 2006, the Iowa Supreme Court Attorney Disciplinary Board (Board) filed a new three-count complaint against Wintroub. Count I alleged that Wintroub had engaged in improper business dealings with a client, Ronald S. Bergman, in violation of various ethical rules. Count II alleged that Wintroub neglected a file when a client matter was dismissed for failure to designate an expert in a timely fashion. Count III alleged that Wintroub improperly handled funds received from a client, Mildred Van Winkle. The events giving rise to these allegations all occurred between 1999 and 2002, approximately the same time period in which Wintroub committed his prior ethical transgressions. The matter was tried to the Commission on stipulated facts.

**C. Bergman Matters.** The undisputed facts reveal that Wintroub and Bergman were close personal friends for many years before the two entered into an attorney-client relationship. Over time, Bergman retained Wintroub to represent him on legal matters, usually involving litigation. Bergman frequently employed more than one attorney on the same matter, however, and Wintroub was not Bergman's attorney for business, corporate, or personal financial matters. The parties stipulated that Bergman believed that Wintroub was acting in his best interest at all times relevant to this disciplinary proceeding and that Bergman trusted Wintroub to do what was right.

In January 1994, Wintroub formed a Nebraska corporation called Takara Enterprises, Inc. for the purpose of buying, promoting, and selling artwork created by Seikichi Takara. In January 1999, at a time when Wintroub was representing Bergman in at least two lawsuits,

Wintroub sold Bergman 22.5 shares of stock in Takara, Inc. for the sum of $150,000. Wintroub did not advise Bergman, a sophisticated investor, to seek independent counsel in connection with the transaction.

Shortly thereafter, Wintroub also procured a personal loan from Bergman. By May 25, 1999, loans totaling $275,000 from Bergman to Wintroub were memorialized in a promissory note drafted by Wintroub. The loan was unsecured and bore a rate of zero percent interest.

Prior to formalizing the loan, Wintroub made several disclosures to Bergman. He told Bergman that (1) he had monies owed to him from his principal client; (2) he had expanded his business in reliance on this client; (3) he had invested his personal financial resources to pay the expenses of his law practice; (4) he had exhausted his credit; (5) he had no other source of funds to keep his law practice in operation; (6) without the loan he might have to cut back his law practice, but would continue to represent Bergman; and (7) he had no idea when he would be able to repay the loan, but that it would certainly be a while. Wintroub did not advise Bergman to seek independent counsel to review the loan documents or transaction.

In 2000 and 2001, Bergman asked Wintroub to start paying on the promissory note, but Wintroub was unable to do so. In December 2000, Wintroub released John Sens, an associate, from his law firm. Sens had previously been assigned several of the Bergman matters. On February 21, 2001, Bergman terminated Wintroub's representation in a litigation matter adverse to James Moyer. Bergman then retained Sens as counsel. Sens sent Wintroub letters dated February 27, March 28, April 4, and June 13 asking Wintroub to deliver the Moyer file to him. Wintroub had conversations with Sens and Bergman in an attempt to persuade them to allow him to continue the representation. Among

other things, Wintroub claimed that he intended the attorney's fees earned in the Moyer matter to be a source of repayment of the Bergman loan. Bergman, however, refused and, on September 12, 2001, filed a declaratory judgment action against Wintroub that, among other things, sought the return of the Moyer file. At this point, Wintroub returned the file. He also declared bankruptcy, thereby frustrating efforts by Bergman to collect on the loan.

**D. Pack Matter.** Wintroub was engaged by Randall and Laraine Pack in connection with an action against Drake University and others, including a nurse practitioner, related to the suicide of their son. During the engagement, an attorney in Wintroub's office failed to designate an expert within the time limitations of Iowa Code section 668.11. As a result, the action was dismissed.

**E. Van Winkle Matter.** In December 2000, Mildred Van Winkle hired Wintroub to sue her former husband for personal injuries arising from an alleged assault and battery and intentional infliction of emotional distress. Suit was filed in March 2001. In connection with the representation, Van Winkle signed a contingency fee agreement, but the agreement was not signed by Wintroub or any member of his firm. On January 11, 2002, Wintroub filed a motion to withdraw from the case "for the reason that [Van Winkle] has retained other counsel to represent her." The district court allowed the withdrawal on the date the motion was filed, but Van Winkle and her new husband met with Wintroub the next day to discuss the case. At that time, Van Winkle signed a contract that reduced Wintroub's contingency fee to 25%, but required immediate payment of $5000 "for work previously done and as a non-refundable engagement retainer." Wintroub did not deposit the $5000 payment in his trust account. Ultimately, the lawsuit was eventually resolved

adverse to Van Winkle on summary judgment because she had failed to reserve the tort action in her marriage dissolution. This case was dismissed through no fault of Wintroub or his firm.

**F. Recommendations of the Commission.** The Commission took no testimony and deliberated on the basis of the undisputed stipulations of fact and related exhibits. The Commission determined that the Board proved by a convincing preponderance of the evidence that Wintroub committed ethical violations in connections with Counts I and III. The Commission dismissed the claim in Count II. In its recommendation, the Commission did not specifically detail which disciplinary rules were violated.

With respect to Count I involving business relationships with a client, the Commission emphasized that Wintroub failed to meet his burden of showing that his transactions with his client were done with full and fair disclosure. With respect to Wintroub's sale of stock to Bergman, the Commission stated that no accounting or other financial records were provided. In connection with the personal loan, the Commission stated that an attorney exercising professional judgment would insist, at a minimum, that sufficient collateral be required to secure the loan. Finally, with respect to the Moyer matter, the Commission observed that it should not have taken seven months and the filing of a declaratory judgment action for Bergman and his counsel to obtain the case file.

On Count II, dealing with the failure to timely designate experts in a malpractice action, the Commission expressed concern regarding Wintroub's attempt to avoid responsibility for the problem. The Commission, however, stated that the problem, while perhaps appropriate for a malpractice claim, did not rise to an ethical violation.

On Count III involving the Van Winkle payment, the Commission simply did not believe Wintroub's explanation that the $5000 fee was received for earned work. The Commission noted that Wintroub filed a motion to withdraw claiming that Van Winkle had retained other counsel. Van Winkle denied any such claim. As a result, the Commission found that Wintroub engaged in retainer fraud and misrepresentation.

On the matter of sanction, the Commission noted that Wintroub incurred a two-year suspension of his Iowa license on May 8, 2003 as a result of reciprocal discipline for events that occurred during the same time period as the current violations. Although the Commission believed that the current violations warranted a suspension of Wintroub's Iowa license for two years, it recommended that the suspension run concurrently with the prior Iowa suspension. Because the previous suspension has expired, the Commission recommended that Wintroub be allowed to apply for reinstatement of his Iowa license, if he so desires.

**II. Standard of Review.**

This court reviews attorney disciplinary actions de novo. Iowa Ct. R. 35.11(3). The Board must prove all ethical violations by a convincing preponderance of the evidence. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Walker*, 712 N.W.2d 683, 684 (Iowa 2006). On review, the court is free to adopt, increase, or reduce the sanction recommended by the commission. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Eich*, 652 N.W.2d 216, 217 (Iowa 2002).

**III. Discussion.**

**A. Business Relations with Client.** Wintroub engaged in two business transactions with a client in which he and his client admittedly had conflicting interests. While there is no blanket prohibition on such

transactions, our ethical rules in this area are very demanding. We have long held that when an attorney engages in business transactions with a client involving conflicting interests, the burden is on the attorney to show that he acted in good faith and made full disclosures. *Comm. on Prof'l Ethics & Conduct v. Mershon,* 316 N.W.2d 895, 899 (Iowa 1982). As a result of this burden, a record that fails to show affirmatively that a client was fully advised about the facts of a transaction or its legal consequences leads to an ethical violation. *Id.*; *Donaldson v. Eaton & Estes,* 136 Iowa 650, 656, 114 N.W. 19, 21 (1907).

We have further found that full disclosure means more than simply disclosing the material terms of a transaction. Full disclosure means the use of active diligence on the part of the attorney to "fully disclose every relevant fact and circumstance which the client should know to make an intelligent decision concerning the wisdom of entering the agreement." *Mershon,* 316 N.W.2d at 898. Further, the attorney must give the same kind of legal advice that the client would have received if the transaction involved a stranger and not the attorney. *Id.* at 899. More recently, we emphasized that lawyers engaged in business transactions with clients involving conflicting interests " 'have a duty to explain carefully, clearly and cogently why independent legal advice is required.' " *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner,* 599 N.W.2d 721, 727–28 (Iowa 1999) (quoting *In re Wolk,* 413 A.2d 317, 321 (N.J. 1980)).

Wintroub made significant material disclosures in connection with both of the Bergman transactions. In connection with the sale of stock in Takara, Inc., however, the stipulation upon which this case was tried did not show that Wintroub disclosed the financial performance of the company through financial statements, annual reports, or oral summaries for the period beginning in January 1994, when Wintroub

formed Takara, until the time of Bergman's investment in January 1999. As a result, Wintroub has failed to meet his burden of showing full disclosure of every relevant fact and circumstance as required by our cases involving business relations with clients. *Mershon*, 316 N.W.2d at 898. Further, there is no record that Wintroub advised Bergman regarding the lack of liquidity ordinarily associated with minority interests in closely held corporations or the lack of control minority interests have over management. Finally, Wintroub admits that he did not advise Bergman of the need to obtain independent counsel in connection with the transaction. Because of Wintroub's failure to demonstrate full factual disclosure and his failure to urge Bergman to seek independent counsel, we conclude Wintroub violated DR 5–104(A) (a lawyer shall not enter into a business transaction with a client if they have differing interests therein and the client expects the lawyer to exercise professional judgment therein for the protection of the client unless the client has consented after full disclosure).

In connection with the personal loan, Wintroub made a robust disclosure of his own dire financial circumstances. Nevertheless, Wintroub committed an ethical violation when he failed to urge Bergman to seek independent counsel prior to entering into this substantial transaction and to explain why independent counsel was important. In connection with the loan transaction, competent independent counsel would have engaged in an interactive process that would have questioned the unsecured nature of the loan, the lack of interest or timetable for repayment, and possible contingencies that could arise, likely demonstrating why the unstructured nature of the loan was not in Bergman's best interests. While Wintroub may have fairly disclosed his financial circumstances, competent counsel would have explored

Bergman's own financial needs and the potential for the unstructured loan transaction serving as a point of contention in the future. The record is devoid of evidence that Wintroub made any of these disclosures. We conclude that Wintroub violated DR 5–104(A) in connection with the loan transaction.

We reiterate, again, our statement in *Mershon* that perhaps the safest and best course for an attorney is to decline to personally participate in business transactions where the attorney and the client have differing interests. *Id.* at 899. The high standard of disclosure expected in these situations is difficult to meet. By insisting that the client obtain independent legal advice, the attorney may avoid any perception that his communications with his client have been colored or less than candid on the transaction in question, but even so, full disclosure of all relevant facts and circumstances is required.

**B. Failure to Return the Client File.** In the aftermath of the loan transaction, Bergman ended Wintroub's representation in the Moyer matter. Thereafter it took seven months, the exchange of multiple letters, and ultimately the filing of an action for declaratory judgment, for new counsel to obtain the file. A seven-month effort to convince a client to change his mind regarding the surrender of a file, culminating in the necessity of filing a declaratory judgment action to enforce the client's rights, is not the kind of behavior expected of attorneys under our disciplinary rules. Clients have a right to the return of their property, including their file. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Plumb*, 589 N.W.2d 746, 748 (Iowa 1999). Through such behavior, Wintroub violated DR 9–102(B)(4) (a lawyer shall promptly deliver to the client as required by a client the properties in the possession of the lawyer which the client is entitled to receive).

**C. Missed Expert Deadline**. The Board has charged Wintroub with neglect based upon the failure of an associate in his firm to meet an expert deadline in a medical malpractice action. We agree with the Commission that this one incident does not give rise to an ethical breach. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Tompkins*, 733 N.W.2d 661, 666–67 (Iowa 2007).

**D. Payment from Van Winkle**. With respect to the payment of $5000 from Van Winkle, the parties stipulated that the payment was made "for work previously done and as a non-refundable engagement retainer" and that the $5000 was not deposited in Wintroub's trust account. While an attorney must deposit unearned fees into a trust account and cannot convert unearned fees for his own use, *Iowa Supreme Court Board of Professional Ethics & Conduct v. Apland*, 577 N.W.2d 50, 55 (Iowa 1998), the precise nature of the $5000 payment is not clear. As a result, we conclude that the Board has not established, on the present record, by a convincing preponderance of the evidence that the $5000 payment was unearned. As a result, we find no *Apland* violation.

**E. Laches and Equitable Estoppel.** Wintroub asserts that the affirmative defenses of laches and equitable estoppel preclude the Board from proceeding with the charges against him. In the alternative, Wintroub argues that the delay in resolving these matters is a factor which mitigates any potential sanction.

The Bergman matters arose during a two-and-a-half-year time frame from January 1999 to June 2001. The Board received a complaint against Wintroub relating to Bergman in February 2002. The Board, however, did not file its charges in this matter for four-and-a-half years.

Wintroub argues that the events for which he is now charged occurred during the same time frame that gave rise to charges in Nebraska, which ultimately led to his suspension from the practice of law in Nebraska for two years. If all these matters had been considered at once, Wintroub argues, he would have received one consecutive period of suspension beginning in 2004.

With respect to laches, Wintroub makes only generalized arguments that he has been prejudiced by the delay in bringing the proceedings. There is nothing in the factual stipulation which identifies witnesses that have died, specific exculpatory evidence that has been destroyed, or specific matters that cannot be developed due to faded memories. We have generally required a factual showing of concrete prejudice before a defense of laches may be invoked. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Mulford*, 625 N.W.2d 672, 680 (Iowa 2001).

On the equitable estoppel issue, Wintroub's argument has similar factual shortcomings. Even assuming that equitable estoppel applies in attorney grievance proceedings, nothing in the record of this case supports the claim that Wintroub has relied upon any action of the Iowa authorities to his detriment. *See The Florida Bar v. McCain*, 361 So. 2d 700, 706 (Fla. 1978) (holding equitable estoppel in disciplinary proceeding requires inducement to change position). In this case, the Iowa complaints were filed, the investigations were opened, and the proceedings initiated. There is nothing in the record to indicate that Iowa authorities made any representation or took any action to induce Wintroub into changing his position in reliance. While it is true that the dates of the Bergman matters overlap with other matters for which Wintroub was sanctioned by Nebraska and by Iowa, the mere existence

of overlapping time frames does not establish a basis for asserting an estoppel defense.

Yet, Wintroub does have a point. He has been severely sanctioned for his past misconduct, but has had no recent misconduct. In addition to a two-year suspension, he complied with the terms of an additional two-year probation in Nebraska. Further, some of his past misconduct appears to have been associated with various medical conditions, which appear to have been resolved. Wintroub's license to practice law in Nebraska has been reinstated.

While Wintroub has not yet sought reinstatement of his Iowa license, an additional period of suspension in Iowa could lead to reciprocal sanctions in Nebraska, thereby unfairly disrupting Wintroub's efforts at rehabilitation. While this disruptive feature does not establish a complete defense, we do find it a factor that should be considered in mitigation. Indeed, it appears that the Commission, which recommended its two-year suspension run concurrently with Wintroub's past suspension, agreed with Wintroub on this point. The impact of the Commission's recommendation would be that no further period of suspension would be required and Wintroub could seek reinstatement in Iowa at any time.

**F. Sanction.** Based on the ethical violations found in Count I, we must consider the appropriate sanction for Wintroub. As indicated above, we agree with Wintroub that the lengthy delay in the proceedings is a mitigating factor. Wintroub has already served his two-year suspension in Nebraska and Iowa, and has satisfied the terms of his probation in Nebraska. He has apparently addressed medical problems that the Nebraska Supreme Court found to be a contributing factor in his ethical lapses. Without this history, Wintroub's ethical violations would

require suspension of his license for a three- to six-month period of time. *See Plumb*, 589 N.W.2d at 749 (imposing two-month suspension for failure to return client file upon request from new attorney); *Comm. on Prof'l Ethics & Conduct v. Hall,* 463 N.W.2d 30, 35–36 (Iowa 1990) (noting that sanctions for conflicting business relations vary from public reprimand to revocation).

In light of all the facts and circumstances, however, and rather than imposing an additional suspension to run concurrently with Wintroub's already completed suspension as recommended by the Commission, we find it more appropriate to issue a public reprimand to Wintroub for the violations therein described. We are confident that this additional sanction in light of the unusual historical circumstances of this file will not be interpreted as a relaxation of our approach to situations where attorneys engage in business relations with clients, which remain subject to the strictest scrutiny, or to the need for attorneys to return client property.

### IV. Conclusion.

We impose a public reprimand on Wintroub rather than the concurrent suspension recommended by the Commission. We tax the costs of this action to Wintroub pursuant to Iowa Court Rule 35.25.

**ATTORNEY REPRIMANDED.**

All justices concur except Wiggins and Hecht, JJ., who take no part.