# IN THE SUPREME COURT OF IOWA

No. 17–0193

Filed September 15, 2017

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

   Complainant,

vs.

**LAWRENCE L. LYNCH,**

   Respondent.

---

On review of the report of the Iowa Supreme Court Grievance Commission.

The grievance commission recommends the suspension of an attorney's license for violations of ethical rules. **LICENSE SUSPENDED.**

Tara M. van Brederode and Susan A. Wendel, Des Moines, for complainant.

Leon F. Spies of Spies, Pavelich & Foley, Iowa City, for respondent.

**MANSFIELD, Justice.**

In an effort to salvage his troubled real estate investments, an attorney borrowed money from certain longtime clients. The attorney failed to advise the clients to obtain independent counsel, failed to obtain their written informed consent, and continued to represent those clients after borrowing the money. The attorney also did not disclose his perilous financial situation. The loans eventually totaled $177,000 in principal amount, none of which has been repaid. The attorney later self-reported his conduct to the Iowa Supreme Court Attorney Disciplinary Board (the Board). The Board charged the attorney with violating Iowa Rules of Professional Conduct 32:1.7(a), 32:1.7(b), and 32:1.8(a).

The parties reached a stipulation concerning the facts and the rule violations but went to a hearing regarding the appropriate sanction. After this hearing, the Iowa Supreme Court Grievance Commission (the commission) recommended suspending the attorney's license for nine months. On our review, we agree that the violations occurred and suspend the attorney's license to practice law for six months.

## I. Background Facts and Proceedings.

Lawrence Lynch was first admitted to the Iowa bar in 1971 and has practiced law in Iowa City his entire professional career. Lynch maintains a small general-practice firm where he is the named partner. Lynch has also invested in real estate and previously owned several rental properties in Iowa City.

In the early 1980s, Lynch began performing legal services on an ongoing basis for Darrel Bell, a farmer in Lone Tree, and Darrel's wife, Carolyn. Lynch represented Darrel and Carolyn in a variety of business and personal matters. Around the same time, Lynch also began acting

as legal counsel for Darrel's son and daughter-in-law, Tom and Terri Bell. Over the years, Lynch formed a close friendship with the Bell family in addition to a good working relationship. Until 2014, Lynch regularly provided paid legal services to Darrel, Carolyn, Tom, and Terri.

In October 2008, Lynch was experiencing personal financial difficulties related to his real estate ventures. He telephoned Darrel and Carolyn, who were then on vacation in Florida, and asked to borrow $90,000 from them. Lynch told Darrel and Carolyn he needed the money the next day. Darrel and Carolyn agreed to lend Lynch the money and took out a corresponding short-term loan from their own bank. Because Darrel and Carolyn were in Florida at the time, they overnighted the check to Lynch the following day. Lynch executed a promissory note for the $90,000, payable June 1, 2009, with a 7.5% interest rate. The following month, Lynch prepared and signed a mortgage giving Darrel and Carolyn a security interest in one of the rental properties Lynch owned. Lynch did not tell Darrel and Carolyn they should retain independent counsel in connection with the transaction, nor did he ask for or receive their informed consent in writing.

In March 2010, Lynch contacted Tom and asked to meet him personally in Coralville. At that meeting, Lynch sought a personal loan from Tom and Terri "to put a roof on one of his buildings." Tom wrote a check for $17,000 that same day. Lynch signed a promissory note to repay the loan, with 8% interest, by August 10. Lynch did not provide any security for the note. Lynch did not tell Tom and Terri they should retain independent counsel in connection with the transaction, nor did he ask for or receive their informed consent in writing.

Later that month, Lynch wrote to Darrel and Carolyn stating that he could not repay their $90,000 promissory note. Lynch explained that

he was "in the process of rebuilding two buildings . . . and because [he] had to evict most of the tenants, it [had] left [him] a little bit shorter than what [he] had anticipated." Lynch therefore included with his letter a written extension to October of the past-due note. He asked Darrel and Carolyn to sign and drop off the extension. Lynch also enclosed a check for $3140.50, which amounted to about a third of the accrued and unpaid interest. Additionally, Lynch prepared and signed a second promissory note to Darrel and Carolyn for $6000, representing the balance of the overdue and unpaid interest.

Darrel and Carolyn signed off on the requested extension. As before, Lynch did not tell them they should retain independent counsel, nor did he ask for or obtain their written informed consent.

As October approached, Lynch again lacked sufficient funds to repay Darrel and Carolyn. He sought another extension and, as before, Darrel and Carolyn agreed. Lynch neither advised Darrel and Carolyn to get independent counsel nor obtained their informed consent.

In February 2012, Lynch asked Darrel and Carolyn to lend him an additional $70,000. In this transaction, Lynch executed a promissory note for $161,000 at 7.5% interest, which covered the $70,000 in new funds while also replacing the previous notes to Darrel and Carolyn for $90,000 and $6000.[1] This note was originally payable in full by October 2013, but repayment was later extended to April 2014. As previously, Lynch did not advise Darrel and Carolyn on the need for independent counsel or obtain their informed consent.

---

[1]Although the note disclosed a principal amount due of $161,000, Lynch later stipulated that the note was intended to consolidate all prior debt to Darrel and Carolyn, with a combined value of $166,000.

In 2013, Darrel, Carolyn, Tom, and Terri took a foreign trip together. During the trip, each of the two couples learned for the first time that Lynch had borrowed money from the other couple.

On January 30, 2014, Darrel died. Lynch filed a petition in probate as attorney for Carolyn, the executor of Darrel's estate. Shortly after this filing, Lynch requested another extension from Carolyn on the outstanding note payable to Darrel and her.

During that timeframe, Lynch attempted to sell many of his properties, including the rental property on which Darrel and Carolyn held a mortgage. Lynch approached Carolyn and asked her to sign a release of that mortgage. Carolyn initially declined, and Lynch then sent her a letter explaining that the mortgage was actually a second mortgage. After payment of closing costs and fees (including $130,000 in delinquent taxes), Lynch's letter explained that the property sale would not generate enough even to satisfy the first mortgage. Accordingly, Lynch proposed that in exchange for the release, he would grant Carolyn a second mortgage on another property.[2] Lynch's letter continued,

> I have no more money to pay other debts that [are] still associated with this property, but all of the other creditors have agreed to work with me. This puts me in a much stronger position to be able to make my payments to you monthly. If I do not receive your release back in my hands to present to the other people, the sale will be lost and the property simply reverts back to the individuals who bought the back taxes and I will have no equity to pay anyone.

On the advice of her children, Carolyn decided to consult with another attorney to review the release.

---

[2]At the disciplinary hearing, Lynch described the second property as consisting of "one old house." Notably, the primary mortgage holder on that property was another of Lynch's clients.

Lynch also obtained counsel. Soon thereafter, he wrote a letter to the Board reporting "what [he] now believe[d] to be" several violations of the Iowa Rules of Professional Conduct related to his dealings with the Bell family.

Since the events described above, Lynch has made some interest payments on his notes to the Bell family. However, he has made no payments of principal.

On May 18, 2016, the Board filed a complaint against Lynch alleging violations of three Iowa Rules of Professional Conduct: rule 32:1.7(a)(2), rule 32:1.7(b), and rule 32:1.8(a). On October 7, the Board and Lynch filed a stipulation of agreed-upon facts and rule violations.

The commission held a hearing for the limited purpose of receiving evidence on the appropriate sanction. Carolyn, Tom, and Terri each testified. Lynch also testified at the hearing. He accepted responsibility for the rule violations. Yet, he was adamant that he had orally advised the Bells that he "could not be their attorney" with respect to the loan agreements.[3] Lynch maintained he did not realize until 2014, when he retained his own counsel, that he also should have notified the Bells in writing of their need to obtain independent counsel before entering into the loan transactions with him. Lynch added that all but one of the investment properties had been sold and that his only way of repaying the Bells would be from future earnings in his law practice.

Lynch further testified that he has been an active member of the Iowa City community, serving on the Iowa City city council in the early 1980s and as an involved member of the Johnson County Bar

___

[3]Telling the Bells he could not be their attorney is not the same as telling them they should retain outside counsel. Regardless, the commission did not find Lynch's testimony in this regard credible.

Association. He indicated that he occasionally does pro bono work, primarily in family law and divorce cases. Lynch has not been the subject of any prior discipline.

Following the hearing, the commission found that Lynch's conduct violated rules 32:1.7(a), 32:1.7(b), and 32:1.8(a). In determining an appropriate sanction, the commission questioned the credibility of aspects of Lynch's testimony. It also was "troubled by the fact that [Lynch] has not even paid all the accrued interest on the money he borrowed," and instead "used sale proceeds from real estate and income from his law practice to retire other personal debt." The commission indicated this kind of misconduct "made wholly vulnerable the relationship between a lawyer and the client" and "warrants a suspension to serve as a penalty to the lawyer and as a deterrent to others." The commission recommended that Lynch's license be suspended for nine months.

## II. Standard of Review.

"We review attorney disciplinary matters de novo." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Pederson*, 887 N.W.2d 387, 391 (Iowa 2016); *see* Iowa Ct. R. 36.21(1). "The Board must prove attorney misconduct by a convincing preponderance of the evidence, a burden greater than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Willey*, 889 N.W.2d 647, 653 (Iowa 2017) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Stoller*, 879 N.W.2d 199, 207 (Iowa 2016)). We give the findings and recommendations of the commission respectful consideration; however, "we may choose to impose a sanction that is lesser or greater than the sanction recommended by the commission." *Id.*

Although stipulations of fact are binding on the parties, *Pederson*, 887 N.W.2d at 391, "[a]n attorney's stipulation as to a violation is not binding on us," *Willey*, 889 N.W.2d at 653 (alteration in original) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kingery*, 871 N.W.2d 109, 117 (Iowa 2015)). "Even if an attorney's stipulation concedes a rule violation, we will only find that a violation occurred if the facts are sufficient to support the stipulated violation." *Id.*

**III. Analysis.**

**A. Rule Violations.** We agree that Lynch violated Iowa Rule of Professional Conduct 32:1.8(a) when he procured personal loans from Darrel and Carolyn Bell in 2008 and 2012 and from Tom and Terri Bell in 2010, as well as when he obtained various extensions of those loans. Rule 32:1.8(a) provides that

> [a] lawyer shall not enter into a business transaction with a client . . . unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing in a manner that can be reasonably understood by the client;
>
> (2) the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and
>
> (3) the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.

Iowa R. Prof'l Conduct 32:1.8(a). We have recognized that a personal loan between an attorney and a client is a "business transaction" within the meaning of this rule. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Dolezal*, 841 N.W.2d 114, 122–23 (Iowa 2013) (loan from an attorney to a client); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wintroub*, 745 N.W.2d

469, 475 (Iowa 2008) (loan from a client to an attorney). "While there is no blanket prohibition on such transactions, our ethical rules in this area are very demanding." *Wintroub*, 745 N.W.2d at 474; *see Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wright*, 840 N.W.2d 295, 302 (Iowa 2013) ("[L]awyers engaged in business transactions involving conflicting interests with clients 'have a duty to explain carefully, clearly and cogently why independent legal advice is required.'" (quoting *Wintroub*, 745 N.W.2d at 474)).

There is no dispute that an ongoing attorney–client relationship existed between Lynch and all four members of the Bell family at the time the loan agreements were entered into. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Fay*, 619 N.W.2d 321, 325 (Iowa 2000) (recognizing that a "client" includes a person "who regularly rel[ies] on an attorney for legal services . . . on an occasional and on-going basis" (alterations in original) (quoting *Comm. on Prof'l Ethics & Conduct v. Carty*, 515 N.W.2d 32, 35 (Iowa 1994))).

In this case, all three branches of the rule—subparts (1), (2), and (3)—were violated. The loan terms were not fair and reasonable. Lynch went to the Bells because he needed immediate money and could not get it elsewhere. The interest rates were low for the risk involved, as subsequent events have proved.[4] We agree with the commission that Lynch did not advise the Bells *orally* of the need to obtain independent counsel, let alone in writing as the rule requires. Informed consent in writing was not obtained. These rule violations were not just technical.

---

[4]Lynch testified he needed the Bells' money to pay "delinquent taxes." The Bells' money "mostly went to taxes." Once Lynch entered into the loan transactions with the Bells, he knew he "had to sell properties" because there was "no way" he could make enough money to repay the loans.

The stipulated facts and exhibits and the hearing record leave no doubt that Lynch did not convey the full extent of his financial distress to the Bells.

Next, we must determine whether Lynch violated rule 32:1.7, which generally prohibits a lawyer from representing a client "if the representation involves a concurrent conflict of interest." Iowa R. Prof'l Conduct 32:1.7(a). According to the rule, a concurrent conflict of interest exists if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." *Id.* r. 32:1.7(a)(2).

We employ a two-step approach to determine whether an attorney has violated rule 32:1.7. *Stoller,* 879 N.W.2d at 207–08. First, we determine whether the attorney's representation of a client is "affected by his 'responsibilities to another client, a former client, or a third person,' " *id.* at 207 (quoting Iowa R. Prof'l Conduct 32:1.7(a)(2)), or here, "by a personal interest of a lawyer," Iowa R. Prof'l Conduct 32:1.7(a)(2). Second, we consider whether the attorney's representation was materially limited by that personal interest. *See Stoller,* 879 N.W.2d at 208.

The comments to rule 32:1.7 explain that if a lawyer's personal financial interests interfere with a client's interests, "it may be difficult or impossible for the lawyer to give a client detached advice." Iowa R. Prof'l Conduct 32:1.7 cmt. 10. This is especially true when a lawyer and client enter into a loan agreement and the lawyer then proceeds to advise the client on other matters. *See In re Appeal of Panel's Affirmance of Dir. of Prof'l Responsibility's Admonition in Panel Matter No. 87–22,* 425 N.W.2d 824, 826 (Minn. 1988) (per curiam) (recognizing that a debtor–creditor

relationship clearly is "an adverse relationship" where the parties have "differing interests" (quoting *In re Conduct of Drake*, 642 P.2d 296, 302 (Or. 1982) (en banc))). Once Lynch was in financial difficulty and had amassed tens of thousands of dollars in debt to the Bells that he could not repay, this created a conflict of interest for any future representation of them. *See* Iowa R. Prof'l Conduct 32:1.7 cmt. 8 (noting that the "critical questions" under the rule are "the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment"); *see also Disciplinary Counsel v. Dettinger*, 904 N.E.2d 890, 891–92 (Ohio 2009) (per curiam) (finding a conflict of interest when the attorney borrowed $25,000 from a client and then "continued to represent [the client] in various commercial and personal transactions"); *In re Conduct of Germundson*, 724 P.2d 793, 795, 796 (Or. 1986) (en banc) (concluding that "the [attorney's] personal position as his client's debtor" for approximately $44,000 "reasonably might be expected to affect his professional judgment in handling the client's financial affairs"); *In re Scott*, 694 A.2d 732, 735 (R.I. 1997) (per curiam) ("By assuming personal responsibility to make the payments on the . . . loan and continuing to represent all the parties to that transaction, [the attorney] violated Rule 1.7(b) of the Rules of Professional Conduct."). Yet, Lynch continued to represent them without a written waiver.

Rule 32:1.7(b)(4) requires that "each affected client give[ ] informed consent, confirmed in writing," to the conflict of interest. Iowa R. Prof'l Conduct 32:1.7(b)(4). Not only did Lynch fail to obtain written informed consent from the Bells before entering into the loan transactions with them, he also failed to obtain written informed consent when he continued to do legal work for them. *See* Iowa R. Prof'l

Conduct 32:1.0(b), (e) (defining "confirmed in writing" and "informed consent"). We therefore agree with the commission that Lynch violated rule 32:1.7.

**B. Sanction.** We must now determine the appropriate sanction for Lynch's misconduct. "We seek to 'achieve consistency with prior cases when determining the proper sanction.'" *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Crotty*, 891 N.W.2d 455, 466 (Iowa 2017) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 769 (Iowa 2010)). Nevertheless, "[a]lthough we consider our prior cases instructive when we determine a proper sanction, '[t]here is no standard sanction for [any] particular type of misconduct.'" *Willey*, 889 N.W.2d at 657 (second and third alterations in original) (quoting *Stoller*, 879 N.W.2d at 218). Instead, "[w]e determine the appropriate sanction for a violation of our rules based on the particular circumstances of each case." *Id.*

> When crafting a sanction, we consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Id.* (quoting *Stoller*, 879 N.W.2d at 219). "Generally, sanctions in cases involving improper business transactions between lawyers and clients range from a public reprimand to revocation." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Johnston*, 732 N.W.2d 448, 456 (Iowa 2007); *accord Fay*, 619 N.W.2d at 326.

Lynch argues the nine-month suspension recommended by the commission is excessive, urging instead that the facts warrant only a thirty-day suspension. Lynch points out that we have imposed sanctions

of far less than a nine-month suspension in other attorney–client business transaction cases.

For instance, in *Wintroub*—a case Lynch cites—an attorney had engaged in two separate business transactions with the same client. 745 N.W.2d at 474. Wintroub and the client "were close personal friends for many years before the two entered into an attorney–client relationship." *Id.* at 472. In the first transaction, Wintroub sold the client several shares of stock in a company the attorney had formed. *Id.* In the second, the attorney procured an unsecured, zero-percent interest loan in the amount of $275,000. *Id.* Although the attorney made "significant material disclosures" in connection with the transactions, it was undisputed that the attorney did not advise the client of the need to obtain independent counsel. *Id.* at 474–75. Once the client put pressure on Wintroub to begin paying back the loan, the attorney was unable to do so. *Id.* at 472. To make matters worse, the attorney then filed for bankruptcy, so the client was not repaid the loan amount. *See id.* at 472.

In determining that only a public reprimand was needed, we pointed out that Wintroub had already served a two-year suspension imposed by the Nebraska Supreme Court for misconduct occurring around the same time as the violations in our case. *Id.* at 477; *see State ex rel. Counsel for Discipline v. Wintroub*, 678 N.W.2d 103, 113–14 (Neb. 2004). We emphasized that "[w]ithout this history, Wintroub's ethical violations would require suspension of his license for a three- to six-month period of time." *Wintroub*, 745 N.W.2d at 477. Accordingly, we cautioned,

> We are confident that this additional sanction in light of the unusual historical circumstances of this file will not be interpreted as a relaxation of our approach to situations

> where attorneys engage in business relations with clients,
> which remain subject to the strictest scrutiny, or to the need
> for attorneys to return client property.

*Id.*

Just recently, in *Pederson*, we suspended an attorney's license for sixty days when, among other things, the attorney violated rule 32:1.8 in obtaining a $29,000 loan from a client. 887 N.W.2d at 390, 393, 395. The attorney needed the funds to repay fees a court had ordered her to repay. *Id.* at 390. As here, the client loan was still outstanding at the time of the hearing. *Id.* There were other significant violations. *Id.* at 391–93.

Also, we recently suspended an attorney's license for sixty days based on his facilitation of an ill-fated loan transaction between two clients. *See Willey*, 889 N.W.2d at 650, 658. In *Willey*, the attorney had been working closely with a "client and business partner" in connection with a business for which the attorney was the registered agent. *Id.* at 650. Willey advised a second client that the business was looking for investors and suggested that the client could invest in the company for $100,000, a transaction which would be structured as a loan. *Id.* The attorney did not obtain informed consent in writing from this second client and did not recommend the client consult with independent counsel prior to advancing the funds in this high-risk transaction. *Id.* at 651. Nearly two years later, the client had not been repaid his $100,000 "investment." *Id.* at 651–52. On review, we found violations of rules 32:1.7(a)(2) (concurrent conflict of interest) and 32:1.7(b)(4) (informed consent). *Id.* at 656.

In determining that a two-month suspension was appropriate in *Willey*, we recognized as an aggravating circumstance the harm to the client, i.e., a loss of $100,000. *Id.* at 658 ("To this day, the [client has]

not received any money for the[ ] investment."). We also noted that the client was not "a sophisticated or wealthy business person who was in a position to lose his and his wife's money." *Id.* We cited repeated instances of the attorney reassuring the client that the money would be coming "soon"—in total, the attorney "continued to tell [the client] the payment would be coming 'just next week' for nearly two years." *Id.* We said these and other aggravating circumstances "weigh[ed] in favor of a longer period of suspension." *Id.*

Earlier, in *Committee on Professional Ethics & Conduct v. Hall*, we went so far as to revoke an attorney's license for improper client business transactions. 463 N.W.2d 30, 36 (Iowa 1990). In that case, the attorney entered into numerous business transactions and joint ventures with a client. *Id.* at 33–35. After several of these ventures failed, the attorney found himself "in severe financial difficulty" and contacted the client about his outstanding debts. *Id.* at 34. The attorney requested that the client cosign a note to pay off a $200,000 debt and personally advance an additional $81,500 to satisfy a second debt. *Id.* The attorney did not advise the client to obtain independent counsel but instead indicated "that the situation regarding the debts was urgent." *Id.* The client agreed and the attorney prepared a document reflecting the agreement, including a provision that released the attorney from "any and all claims" the client may pursue against the attorney or his law firm in the future. *Id.* Ultimately, however, the attorney's financial problems did not improve, and the client was forced to pay most of the money owed on the debts. *Id.*

We revoked the attorney's license to practice law. *Id.* at 36. The attorney in that case had committed several other serious rule violations. *Id.* at 32–35. There was a separate docket involving the attorney's acts of

bank fraud. *Id.* at 32–33. The attorney also gave false testimony in a sworn deposition. *Id.* at 35. Still, we also took note of the severity of the violations surrounding the attorney's financial dealings with his client. *Id.* at 36. We pointed out that the attorney "did not enter into a one time transaction with [the client] but, rather, a series of transactions occurring over a four year period." *Id.* We recognized these transactions ended up costing the client "several hundred thousand dollars," and "[s]ome of the transactions were solely for the benefit of [the attorney]." *Id.*

Several aggravating circumstances exist in the present case.[5] Lynch repeatedly went to the Bell family to borrow money over a period of several years. We have emphasized that "[a] lawyer who engages in a pattern of repeated offenses, even those of minor significance when considered separately, can project indifference to the legal obligations of the profession." *Pederson*, 887 N.W.2d at 394; *accord Hall*, 463 N.W.2d at 36 (taking into account the number of transactions between attorney and client as well as the relevant time period).

Lynch's misconduct resulted in serious economic harm to the Bells. "Generally, 'more severe discipline is warranted when the ethical violations cause harm to clients.'" *Wright*, 840 N.W.2d at 303 (quoting *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Jay*, 606 N.W.2d 1, 4

---

[5]The parties have stipulated as to various aggravating and mitigating factors. To the extent the parties have stipulated to *facts* (e.g., that Lynch has done work within the community, including serving on the city council), those facts are binding on us. *See, e.g.*, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Waterman*, 890 N.W.2d 327, 331 (Iowa 2017). Stipulations of *law* (e.g., that community service can be considered a mitigating factor) are not. *See, e.g.*, *State v. Mary*, 368 N.W.2d 166, 170 (Iowa 1985) (determining that the parties' stipulation of the applicability of a law was nonbinding in a criminal case). Nevertheless, we generally agree with the parties' views as to the respective aggravating and mitigating factors.

(Iowa 2000)); *see Willey*, 889 N.W.2d at 658 ("We consider harm to a client an aggravating factor."). In *Wright*, we suspended the attorney's license for twelve months, due in part to the fact that the attorney had facilitated numerous loans from five different clients in the total amount of $236,500. *See* 840 N.W.2d at 297–98, 304. Here, Lynch's conduct has caused the Bell family to lose $177,000 in principal that was advanced to Lynch. The Bells have also spent over $13,000 in attorney fees attempting to collect the still unpaid loans.

Finally, we consider the fact that Lynch has over forty years of experience as a licensed attorney in Iowa. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bartley*, 860 N.W.2d 331, 339 (Iowa 2015) (noting that an attorney's "experience should have guided her away from the violations that occurred in th[at] case"). At the hearing, Lynch testified he was unaware that he needed to advise the Bells in writing that they should seek independent counsel or that he should have obtained their written informed consent. The commission did not find this testimony credible; nor do we. An attorney with Lynch's experience would know better.

Several mitigating circumstances are also present. Lynch has not been the subject of prior discipline. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Qualley*, 828 N.W.2d 282, 294 (Iowa 2013) (recognizing as a mitigating factor that "the record does not disclose any prior disciplinary action"). He has a lengthy history of serving his community. *See Willey*, 889 N.W.2d at 658 ("Willey has engaged in extensive community service, which we also consider a mitigating factor."). Lynch also performs pro bono legal representation, primarily in family law and divorce cases. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Waterman*, 890 N.W.2d 327, 332 (Iowa 2017) (recognizing pro bono

work as a mitigating factor). In addition, Lynch has self-reported his misconduct, generally taken responsibility for that misconduct, and cooperated with the investigation. *See id.* (noting these mitigating factors). Having said that, Lynch did not self-report until June 2014, after he knew the Bells had sought out independent counsel. *See Bartley*, 860 N.W.2d at 339 (recognizing that self-reporting is a mitigating factor but may be "lessened somewhat" depending on the circumstances).

We conclude that Lynch's license should be suspended indefinitely without possibility of reinstatement for six months. The misconduct here was more serious than that involved in *Pederson* and *Willey*. To bail out his collapsing real estate investments, Lynch turned to his longstanding clients, serially obtaining loans that undoubtedly no commercial lender would have made. Lynch provided no meaningful disclosures to his clients of the sort a commercial lender would have required and instead told them he needed the money right away. If Lynch had done even part of what rule 32:1.8 requires, in all likelihood the loans would never have occurred. Through his ethical violations, Lynch took advantage of his clients for his personal benefit. As the commission put it, "Respondent's misconduct has made wholly vulnerable the relationship between the lawyer and the client."

Still, the Board does not contend, nor has it attempted to prove, that Lynch engaged in fraud. The violations, although serious and recurring, had a single starting-point and were "uncharacteristic" when measured against the attorney's lengthy legal career. *See Bartley*, 860 N.W.2d at 337, 339 (imposing a six-month suspension on an attorney for neglect and improper fee payment compounded by "a series of knowing misrepresentations to her law firm and the court" and "fraudulently

prepared documents"). *Wintroub* therefore appears to us to be a relevant precedent. 745 N.W.2d at 474. For these reasons, and after taking into account all the matters relevant to sanction described above, we impose a six-month suspension.

## IV. Conclusion.

For the reasons stated, we suspend Lynch from the practice of law with no possibility of reinstatement for six months. This suspension applies to all facets of ordinary law practice. *See* Iowa Ct. R. 34.23. Lynch must timely notify his clients in all pending matters pursuant to Iowa Court Rule 34.24(1). At the conclusion of the suspension, Lynch will be required to file a written application for reinstatement. *See id.* r. 34.23(1).

To establish his eligibility for reinstatement, Lynch must also demonstrate that he has either repaid the Bell loans, entered into agreed-upon plans with the Bells for repaying the loans (and be current on those plans), or filed bankruptcy in order to discharge or restructure the loans. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Walters*, 603 N.W.2d 772, 778 (Iowa 1999) (conditioning reinstatement on the attorney repaying a judgment relating to a loan transaction with a former client); *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ries*, 812 N.W.2d 594, 600 (Iowa 2012) (conditioning reinstatement on repayment of a small claims judgment owed to former clients).

Lynch is assessed the costs of this action. *See* Iowa Ct. R. 36.24(1).

**LICENSE SUSPENDED.**