# IN THE SUPREME COURT OF IOWA

No. 15–1824

Filed May 13, 2016

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

 Complainant,

vs.

**LARRY ALAN STOLLER,**

 Respondent.

On review of the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission reports respondent committed ethical misconduct involving two clients and recommends a combination of a public reprimand and a concurrent three month suspension. **LICENSE SUSPENDED.**

Tara M. Van Brederode and Patrick W. O'Bryan, Des Moines, for complainant.

Kevin J. Driscoll and Kellen B. Bubach of Finley Law Firm, P.C., Des Moines, for respondent.

**ZAGER, Justice.**

In this disciplinary case, the Iowa Supreme Court Attorney Disciplinary Board (Board) charged an attorney with violations of several of our ethical rules arising out of two separate matters. After a hearing, the Grievance Commission of the Supreme Court of Iowa found that in the first matter, the attorney violated the rules regarding conflicts of interest and conduct involving dishonesty, fraud, deceit, or misrepresentation. The commission also found violations of the rules regarding conflicts of interest arising out of the attorney's representation of the second client. The commission recommended we suspend the attorney's license for a total of three months. Upon our de novo review, we concur in most of the findings of rule violations but find that the appropriate sanction is a sixty-day suspension.

## I. Background Facts and Proceedings.

Attorney Larry Stoller obtained a law degree from Creighton University in 1980 and received his license to practice law in Iowa in the same year. Stoller has practiced in his own firm with partners in the past but is currently a sole practitioner. His practice is located in Spirit Lake, Iowa. He has had one prior public reprimand. The current case involves two separate client matters. The first matter arises from Stoller's actions with regard to Okoboji Cocktails, Inc. (OCI matter), and the second matter arises from Stoller's actions with regard to his former clients, Robert and Marcia Zylstra (Zylstra matter). Each matter will be discussed in turn.

**A. OCI Matter.** The OCI matter arises from a lease between OCI and Stoller's clients, Martin and Melinda Marten. OCI leased property from the Martens for the operation of a restaurant and bar. It was an oral lease which called for monthly rent of $1725.

OCI was a corporation formed in 2007 with three investors: Troy Dahl, his mother Jolene Schmidtke, and Diane Chaplin. Each of the investors received shares of stock in OCI. The officers of OCI were Troy Dahl, President; Jolene Schmidtke, Secretary; and Diane Chaplin, Vice President. Chaplin was also the registered agent for OCI. Chaplin managed OCI for approximately three years. In March 2010, Chaplin had a falling out with Dahl and Schmidtke over compensation for her services, and Chaplin was terminated and thereafter locked out of OCI. Chaplin's name was taken off the OCI bank accounts. Dahl and Schmidtke continued to operate OCI. Chaplin retained her stock in OCI, was never removed as an officer of the corporation, and continued as the registered agent for OCI according to the Secretary of State's website. Chaplin testified that she wrote a letter of resignation from the corporation on her home computer around this time and gave it to Stoller to send to Schmidtke and Dahl. However, Stoller does not have any recollection of delivering any such letter.

In September 2010, the corporation did not file its biennial report with the Secretary of State and the corporation was administratively dissolved. As a result, OCI was unable to obtain a new liquor license in January 2011. Dahl and Schmidtke did not notify the Martens that they were closing the business and abandoned the premises. OCI did not pay February rent to the Martens, which alerted the Martens to the abandonment. When the Martens' rental agent, Sara Anderson, attempted to contact Dahl regarding the past-due rent, she did not receive any response. After the failed attempts to contact Dahl, Anderson visited the premises. She found that the door had been left open, the utilities were turned off, and rotten food and garbage were

strewn about the restaurant. Since Stoller represented the Martens, she contacted him for advice.

Stoller advised Anderson and the Martens that Schmidtke and Dahl's behavior meant they had abandoned the property and the Martens had the duty to mitigate their damages by securing the property and preventing further waste. Pursuant to Stoller's advice, Anderson changed the locks, turned the heat back on, and cleaned the food and garbage from the restaurant. After the locks were changed, Stoller sent a letter to OCI, Dahl, and Chaplin notifying them of the abandonment and advising them that the Martens were requesting past-due rent and damages for the clean-up. Stoller also advised them of the Martens' intent to exercise all rights as to a landlord's lien on the remaining property. Once the locks were changed, OCI was barred from re-entering the building or from obtaining the restaurant and bar equipment that remained.

On March 29, Stoller sent a "Notice of Retention of Equipment and Fixtures" to Chaplin only as the registered agent of OCI. The notice stated that OCI had twenty days to either pay the past-due rent or object to the Martens' retention of all of the personal property, fixtures, and equipment remaining in the leased premises. If OCI did not respond, the Martens would sell the remaining assets in full satisfaction of any indebtedness of OCI. Because it was sent only to Chaplin, no contact was made with either Schmidtke or Dahl regarding the notice. Despite having been in business with Schmidtke and Dahl for three years, Chaplin claimed that she did not have any knowledge of how to contact them about the notice.

On March 30, ostensibly on behalf of OCI, Chaplin signed a "Consent to Landlord's Retention of Equipment Secured By Landlord's

Lien," giving sole ownership of all of the remaining assets of OCI to the Martens in satisfaction of OCI's rental liability.

On April 4, Troy Dahl, on behalf of OCI, sent a letter to the Martens demanding access to the leased premises for the purpose of removing the personal property and equipment.[1]  On April 6, Stoller established a new corporation on behalf of Chaplin, Chaplin's Inc. Through this new corporation, Stoller negotiated a new lease whereby Chaplin leased the premises previously leased to OCI, as well as the furnishings and equipment.  The Martens charged Chaplin the same monthly rent.  Chaplin then opened a new bar and restaurant in the same location using the OCI equipment she had allowed the Martens to retain.  The only difference was Chaplin called her bar and restaurant "Chaplin's."  The record does not disclose that there were any discussions between Stoller, the Martens, or Chaplin about the potential conflict of interest between the parties, or a formal waiver of the conflict.[2]

By April 8, Peter C. Cannon officially began representing OCI.  On this date, Cannon sent a letter to Stoller advising him of his representation of OCI and making reference to a letter Stoller had written to Cannon on April 6 suggesting that Stoller was somehow representing OCI.  However, the record does not contain this letter.  Cannon again

---

[1]The letter is dated 2010 and makes reference to a deadline also dated 2010. However, it is clear that the year should be 2011.

[2]In late May, Stoller orally advised the Martens and Chaplin of the conflict of interest and the associated risks.  On May 30, the Martens and Chaplin signed a waiver of the conflict that stated:

> By their respective signatures below the parties hereto acknowledge that each of them has requested that Larry Stoller represent them as legal counsel regarding their respective rights and causes of action against Okoboji Cocktails, Inc, and preparation of a lease for certain premises in the Marten's mall in Arnolds Park, Ia. wherein the Martens will be landlords and Diane Chaplin or her corporation will be the tenant.

demanded access to the formerly leased premises for purposes of removing OCI personal property and equipment left on the business premises. The Martens refused since they had already leased the equipment to Chaplin.

Ultimately, OCI brought an action in replevin to recover the equipment. After a hearing, the district court issued its order on June 13. In relevant part, the district court found the transaction between Chaplin and the Martens was a sham transaction. The district court held that even if Chaplin were the registered agent and an officer of the corporation, she would not have had the authority—actual or apparent—to sell all or substantially all of the assets of the corporation. The district court further held that the equipment had a value of $35,785 "in place," and a liquidation value of $16,046.50. The district court ultimately concluded that OCI owned the equipment, but since the Martens possessed a landlord's lien, they were still entitled to possession superior to the claim of OCI. The district court denied the temporary writ of replevin. However, in its order on reconsideration dated July 1, the district court concluded that OCI had a superior right to the property and it was entitled to a writ of replevin and possession of the property upon the filing of an appropriate bond.

OCI ultimately filed a lawsuit against the Martens and Chaplin for the recovery of the bar and restaurant equipment. Stoller continued to represent the Martens and Chaplin in this lawsuit, including the filing of numerous counterclaims brought on behalf of the Martens and Chaplin. In August, OCI filed a motion to amend its petition to name Stoller as an additional defendant. The district court granted the motion to amend the petition and also granted the motion to remove Stoller as the attorney for

the Martens and Chaplin. Stoller's malpractice carrier provided his defense, and eventually a settlement was reached.

**B. Zylstra Matter.** Many of the facts underlying the Zylstra matter are also included in our related case filed today, *NuStar Farms, LLC v. Zylstra,* ____ N.W.2d ___, ___ (Iowa 2016).

1. *NuStar Farms Representation.* Stoller began representing Robert and Marcia Zylstra in 2002. He thereafter represented them in a number of legal matters between 2002 and 2014. Although Stoller represented the Zylstras on a number of legal issues, they also used the services of other attorneys throughout this time period. At issue for the purposes of this disciplinary proceeding are a meeting in January 2007 and a small claims case concluding in 2014.

On January 24, 2007, Stoller met with Robert Zylstra at his office to discuss several manure easement agreements and estate planning. At the time of the meeting, the Zylstras were part owners of Sibley Dairy, LLP, which was in the process of selling its dairy operation to NuStar Farms, LLC. Stoller did not represent Sibley Dairy in this sale. However, Robert asked Stoller for his advice on several manure easement agreements that Robert and his wife, individually, were negotiating with NuStar Farms. There is a dispute regarding the extent of Stoller's advice on the manure easement agreements. However, it is clear that Stoller reviewed the agreements, made notes on the agreements, and suggested Robert seek the advice of other, more experienced agricultural law attorneys. This is confirmed in Stoller's office note from the meeting and a follow-up correspondence to Robert. In the follow-up email, Stoller stated that he "briefly looked at" the manure easements at Robert's request. Stoller further wrote, "The changes you were talking about should be run by [the other attorney] and I suggest that if approved they

be included in the easements. I would also think some permit would be necessary." Stoller billed the Zylstras for 1.20 hours and described the meeting as a "[c]onference with Robert on manure easement; review easements and agreement." Nothing in the record indicates that Stoller provided any other professional services to the Zylstras on the manure easement agreements with NuStar.

Stoller continued to represent the Zylstras in a number of other matters between 2007 and 2014. In December 2013, Stoller began representing the Zylstras in a small claims matter. The case was submitted to the small claims court on February 10, 2014, but the court did not enter its ruling until May 30. Stoller began representing NuStar in early May in an action regarding loan covenants. Also in early May, Stoller began contacting the Zylstras on behalf of NuStar. At least part of these contacts involved the Zylstras' failure to provide NuStar with a deed to property involving ingress. Stoller acknowledges that he contacted Robert about the need for the Zylstras to sign the deed. On May 13, Stoller sent the Zylstras an email that stated it was the third time he had contacted them about the deed to ingress property sold by the Zylstras to NuStar. Stoller wrote in the email,

> I must now put you on formal notice that if the signed deed is not received by my office by the close of business on Wednesday, May 14, 2014, that I will need to pursue the appropriate remedies for specific performance and damages on behalf of Nustar.

Stoller also wrote in his email, "I have tried to remain neutral in those matters and advised each party that I could represent neither." However, in the same email, Stoller informed the Zylstras that he would no longer be representing them. Stoller emailed the Zylstras again the next day and expressed disappointment that the Zylstras were not going to sign

the deed. Stoller also took the opportunity to remind Robert of his prior financial troubles and how Stoller had helped him in the past.

By May 15, the Zylstras had retained John Sandy to represent them in their dealings with NuStar. In Sandy's correspondence to Stoller that same day, he alerted Stoller that the Zylstras found his representation of NuStar to be a conflict of interest based on his prior legal representation and counsel provided to them. Sandy specifically requested that Stoller cease further representation of NuStar when those interests conflicted with the Zylstras'.

On June 5, Stoller sent the Zylstras a letter notifying them of the judge's ruling in the small claims case and informing them that he believed the decision was appealable. Stoller further notified the Zylstras of their right to appeal and applicable deadlines. Stoller wrote that he would be willing to file an appeal on their behalf and included information about his retainer and billing rate. Stoller also advised the Zylstras that they could have another attorney represent them.

On July 9, Stoller filed a multicount petition on behalf of NuStar against the Zylstras. The petition alleged that the Zylstras agreed to sell NuStar a parcel of farmland in 2008 but that they had failed to tender the deed. The petition further alleged that the Zylstras had failed to abide by certain terms of the manure easement agreements. The Zylstras followed with a motion to disqualify Stoller as the attorney for NuStar. The district court held a hearing on the motion to disqualify but ultimately found that Stoller could continue with his representation. The Zylstras have appealed that order, which we address in *NuStar*, ___ N.W.2d at ___.

2. *Firearm.* After the Board filed its complaint against Stoller, Robert sent a letter to Pat O'Brien, counsel for the Board, regarding a

firearm incident with Stoller. Robert stated in his letter that there had been a pretrial conference in the small claims case in May or June 2014, during which Stoller pulled a .44 Magnum pistol out of his briefcase. Robert further stated that Stoller was waving the pistol in the air and said that he would "take care of" John Maloney, the opposing party. Robert told O'Brien that he was scared that Stoller would attack him physically and that he obtained a concealed carry permit for this reason. Stoller does not deny that he took a firearm out in Robert's presence, but he claims that it occurred in his office and it was "a joking incident amongst men." He further asserts that he keeps the gun in his desk because he has been attacked in his office on two separate occasions. Stoller denies that he ever threatened to harm anyone.

**C. Disciplinary Proceedings.** The Board filed a complaint with the commission on January 22, 2015, alleging that Stoller violated a number of the Iowa Rules of Professional Conduct in his representation in both the OCI matter and the Zylstra matter. The commission held the disciplinary hearing on August 13 and 14. During the hearing, Stoller disclosed that he suffers from serious depressive disorder, and it has affected both his mood and his ability to function in the past. He also stated that he is currently undergoing treatment for his depressive disorder, and the treatment is effective in controlling it. Stoller is also diabetic. He informed the commission that the two conditions have resulted in him cutting back ("slacking back") on his practice. However, he also expressed the desire to not have the commission rely on his health as a mitigating factor. Stoller also acknowledged during his hearing that some of his correspondence had an antagonistic tone and that his conditions may have resulted in the emotionally-evoked responses.

The commission issued its findings of fact, conclusions of law, and recommendations on October 30. The commission found that Stoller violated several rules. It found that Stoller violated rules 32:1.7(a)(2) and 32:8.4(c) in the OCI matter. It found that he violated rules 32:1.7(a)(2), 32:1.7(b)(4), and 32:1.9(a) in the Zylstra matter. The commission recommended a public reprimand for the rule 32:1.7(a)(2) violation and a three-month suspension for the rule 32:8.4(c) violation in the OCI matter. It recommended a concurrent three-month suspension for the three rule violations in the Zylstra matter. It also recommended that Stoller be prohibited from possessing a firearm while conducting any legal business as a condition of his reinstatement. Stoller argues that the facts do not support a finding that he violated any of the Iowa Rules of Professional Conduct. He further argues that the punishment recommended by the commission is too harsh.

## II. Standard of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cross*, 861 N.W.2d 211, 217 (Iowa 2015). "The Board must prove attorney misconduct by a convincing preponderance of the evidence, a burden greater than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Id.* We give the findings and recommendations of the commission respectful consideration, but we are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ricklefs*, 844 N.W.2d 689, 696 (Iowa 2014). If we find the Board proved misconduct, we may choose to impose a sanction that is lesser or greater than that recommended by the commission. *Cross*, 861 N.W.2d at 217.

### III. Analysis.

**A. OCI Matter Rules Violations.** The Board's amended complaint alleged that Stoller violated rules 32:1.7(a)(2), 32:1.7(b)(4), 32:4.2(a), and 32:8.4(c) in connection with the OCI matter. The commission found that Stoller violated rules 32:1.7(a)(2) and 32:8.4(c) in relation to that matter. On our de novo review, we analyze each rule in turn.

1. *Rule 32:1.7 violation—conflict of interest.* Iowa Rule of Professional Conduct 32:1.7(a) provides that an attorney cannot represent a client if there is a concurrent conflict of interest. There are two types of concurrent conflicts of interest. Iowa R. Prof'l Conduct 32:1.7(a). A conflict of interest exists under subsection (a)(1) if a lawyer's representation is "directly adverse to another client," while a conflict of interest exists under subsection (a)(2) when "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." *Id.* The Board found that the concurrent conflict of interest in the OCI matter fell under the "materially limited" prong of subsection (a)(2).

There are two steps to determining whether a violation of rule 32:1.7(a)(2) has occurred. First, we must determine whether Stoller's representation of one client is affected by his "responsibilities to another client, a former client, or a third person." *Id.* r. 32:1.7(a)(2). In this context, "another client" means a current client. *See State v. McKinley*, 860 N.W.2d 874, 882 (Iowa 2015). We must determine whether Stoller's representation of Chaplin was affected by his responsibilities to the Martens.

In this case, Stoller had been representing the Martens for a number of years. At least as far as this case is concerned, his representation of Chaplin began in March 2011. Although he likely began giving Chaplin advice earlier, Stoller was representing Chaplin by March 30 at the latest. It was on March 30 that Chaplin signed the consent form to allow the Martens to retain the bar and restaurant equipment owned by OCI in satisfaction of OCI's rental liability. At this point, Stoller began representing both Chaplin and the Martens, and what the replevin court called the "sham transaction" began.

Soon after this consent exchange, Stoller established a corporation for Chaplin and her restaurant and helped Chaplin and the Martens enter into a new lease agreement for the old OCI premises. Although Stoller began his representation of both parties in March, he did not have the parties sign a form to consent to the conflict until May 30, at least two months after representation began and after the parties had already entered into both the consent form and a new lease. During the time that Stoller was representing Chaplin in establishing her corporation, he was also representing the Martens.

Next, we must determine whether Stoller's representation of Chaplin was materially limited by his representation of the Martens. Iowa R. Prof'l Conduct 32:1.7(a)(2). The comments to the rule expand on the definition of material limitation:

> [A] conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.

*Id.* r. 32:1.7 cmt. 8. The comments also provide an example of a material limitation:

> For example, a lawyer asked to represent several individuals seeking to form a joint venture is likely to be materially limited in the lawyer's ability to recommend or advocate all possible positions that each might take because of the lawyer's duty of loyalty to others. The conflict in effect forecloses alternatives that would otherwise be available to the client.

*Id.*

Under our old rules, Canon 5 provided that a lawyer shall not represent two parties with differing interests. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Wagner*, 599 N.W.2d 721, 726 (Iowa 1999). While the language was not exactly the same as the language under our present concurrent-conflict-of-interests rule, a "differing interest" included "every interest that will adversely affect either the judgment or loyalty of a lawyer to a client, whether it be a *conflicting,* inconsistent, diverse, or other interest." *Id.* (emphasis added) (quoting Iowa Code of Prof'l Resp. for Lawyers, Definition (1) (1999)). *Compare id. with* Iowa R. Prof'l Conduct 32:1.7. Under our old rules, we held that a lawyer could not represent two clients when one client was the buyer and the other the seller of real estate. *Wagner*, 599 N.W.2d at 726–27. Similarly, we held that a lawyer could not represent two clients when one was the lessor and the other the lessee in a landlord–tenant relationship. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Fay,* 619 N.W.2d 321, 325 (Iowa 2000). We recognized that there are a number of conflicts that exist in these types of relationships:

> The process by which a buyer and seller of property transact their business is fraught with conflicts of interest. Indeed, a lawyer's simultaneous representation of a buyer and a seller in the same transaction is a paradigm of a conflict of interest. Beginning with such basic elements as determining the price and describing the property to be sold, what one party gets the other must concede.

*Wagner,* 599 N.W.2d at 726 (quoting Charles Wolfram, *Modern Legal Ethics* § 8.5, at 434 (1986)). Our past cases, therefore, have made it clear that a lease arrangement between a landlord and tenant constitutes a "business transaction" for the purposes of our old concurrent-conflict-of-interests rule. *Fay,* 619 N.W.2d at 325 ("The competing interests of a lessor and lessee necessarily present a conflict of interest under the rule.").

The same rationale applies under our new concurrent-conflict-of-interests rule. Similar language is used when referring to joint ventures in the explanation contained in the comments to rule 32:1.7. Iowa R. Prof'l Conduct 32:1.7 cmt. 8. Stoller's role in representing Chaplin, the tenant, is at odds with his representation of the Martens, the landlords. Stoller's representation of both parties prevented him from adequately advising each party of all available alternatives.

The Restatement of the Law Governing Lawyers defines a materially adverse effect "by reference to obligations necessarily assumed by the lawyer." Restatement (Third) of the Law Governing Lawyers § 121 cmt. *c*(*ii*), (2000). Those obligations include the duty to "proceed in a manner reasonably calculated to advance a client's lawful objectives," the duty of competence and diligence, the duty to keep a client's confidences, the duty to avoid conflicting interests, the duty to deal honestly with the client, the duty not to act adversely toward the client, and the duty to fulfill contractual obligations to the client. *Id.* at 16.

Similarly, under our rules, a lawyer owes a number of duties to a client. Among the duties a lawyer owes their client are the duties of

competence,[3] diligence,[4] and communication.[5] Iowa Rs. Prof'l Conduct 32:1.1, 1.3, 1.4. In determining whether Stoller's representation was materially limited, we must ask whether Stoller was able to fully perform all of these duties to each of his clients—both Chaplin and the Martens. We agree with our prior cases that the position of a landlord and a tenant are enough at odds that one attorney's representation of both parties creates a concurrent conflict of interest that requires the informed, written consent of both parties.

If a concurrent conflict of interest exists, an attorney can cure the conflict and continue to represent the clients. *Id.* r. 32:1.7(b). Pertinent to the facts of this case, one of the steps an attorney must take to

---

[3]"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation." Iowa R. Prof'l Conduct 32:1.1.

[4]"A lawyer shall act with reasonable diligence and promptness in representing a client." *Id.* r. 32:1.3.

[5]  (a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent . . . is required by these rules;

(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;

(3) keep the client reasonably informed about the status of the matter;

(4) promptly comply with reasonable requests for information; and

(5) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Iowa Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

*Id.* r. 32:1.4.

continue to represent both clients is to receive written, informed consent from each affected client. *Id.* r. 32:1.7(b)(4).

While Stoller did obtain written consent from both Chaplin and the Martens in this case, he did not obtain the consent until well after he had undertaken the representation of both parties. As discussed above, Stoller had represented the Martens for a number of years. He began representing Chaplin in late March 2011, when he prepared the consent form and advised her to sign the consent form effectively transferring all of the assets of OCI to the Martens. Stoller then helped Chaplin establish a corporation and wrote the lease agreement between the Martens and Chaplin's new corporation. Stoller did not obtain written consent from the parties until May 30, well after the material events had already occurred.

Although Stoller seems to have cured the conflict because he did obtain written consent from both Chaplin and the Martens, we must analyze what impact, if any, the timing of the written consent has on the rule violation. Rule 32:1.7, comment 2 states,

> Resolution of a conflict of interest problem under this rule requires the lawyer to: 1) clearly identify the client or clients; 2) determine whether a conflict of interest exists; 3) decide whether the representation may be undertaken despite the existence of a conflict, i.e., whether the conflict is consentable; and 4) if so, consult with the clients affected under paragraph (a) and obtain their informed consent, confirmed in writing.

*Id.* r. 32:1.7 cmt 2. The comments contemplate that conflicts can arise at different stages of representation and outline how an attorney should react to a conflict that exists before representation and one that arises after representation has already been undertaken. *Id.* r. 32:1.7 cmts. 3, 4. If a conflict exists before an attorney begins the representation, "the representation must be declined, unless the lawyer obtains the informed

consent of each client under the conditions of paragraph (b)." *Id.* r. 32:1.7 cmt. 3. The comments clearly provide that, in the event the attorney can predict a conflict, he or she must obtain written consent from both clients before proceeding with the representation of both parties.[6]

At the time Stoller began representing Chaplin, he knew or should have known that a conflict existed between Chaplin and the Martens. When Stoller drafted the landlord–tenant agreement between Chaplin's corporation and the Martens, he was well aware of the possibility of a conflict between a landlord and a tenant. This is especially true given the context of the relationship between the two parties—this particular relationship between Chaplin's corporation and the Martens would not exist if the previous landlord–tenant relationship between the Martens and OCI had not fallen apart. Likewise, Chaplin still had an ownership interest in and duties with respect to OCI.

The commission found that the Board proved a violation of rule 32:1.7(a) but did not prove a violation of rule 32:1.7(b) by a convincing preponderance of the evidence. However, we consider the subsections of the rule together, and find that the Board proved a violation of rule 32:1.7 by a convincing preponderance of the evidence.

2. *Rule 32:4.2(a) violation—communication with persons represented by counsel.*

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the

---

[6]In the event that a conflict arises after representation has already started, the lawyer must either withdraw or obtain consent as soon as the conflict is recognizable. *Id.* r. 32:1.7 cmt. 4.

matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.

*Id.* r. 32:4.2(a). This rule applies regardless of whether the represented person initiates the contact or purports to consent to the communication. *Id.* r. 32:4.2 cmt. 3; 16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series: Lawyer and Judicial Ethics* § 8:2(b)(1), at 778 (2015) [hereinafter Sisk & Cady]. The ethical responsibility to enforce this rule belongs to the attorney. 16 Sisk & Cady § 8:2(b)(1), at 778. The harm this rule seeks to prevent is "that the lawyer may be motivated when communicating with a represented person to overreach and interfere with the attorney–client relationship to the harm of that represented person." *Id.* § 8:2(b)(3), at 782.

There are four elements we consider when determining whether an attorney made a contact with a represented party that violated our rules. *Id.* § 8:2(b)(1), at 778. An attorney is prohibited from communicating with a represented party if

> (1) The communication occurs while the attorney is representing a client.

> (2) The communication concerns the subject of the other attorney's representation.

> (3) The attorney knows that the person with whom he or she is communicating is represented by counsel on the subject of the communication.

> (4) The other lawyer has not consented or the communication is not otherwise authorized by law.

*Id.* (footnotes omitted).

Pertinent to this case, the comments to the rule discuss communications with members of represented organizations:

> In the case of a represented organization, this rule prohibits communications with a constituent of the organization who supervises, directs, or regularly consults with the organization's lawyer concerning the matter or has authority

to obligate the organization with respect to the matter or whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability.

Iowa R. Prof'l Conduct 32:4.2 cmt. 7.

The communications at issue in this case are Stoller's telephone calls with Jolene Schmidtke, one of the shareholders of OCI. Schmidtke alleged that Stoller called her on May 10 and May 15, 2012.[7] The alleged purpose of these calls was to convince her that OCI should not move its equipment out of the old restaurant location and instead should leave it in his clients' possession. However, by the time of the hearing in front of the commission, Schmidtke was unable to remember any details of the phone calls with Stoller except that they were brief. Stoller admits that he called Schmidtke during the pendency of the case. However, he claims he made the phone calls for the purpose of obtaining tax documents from Schmidtke so Chaplin could file her own taxes. He claims that both phone calls were unrelated to the underlying dispute between OCI and Chaplin.

The commission found that Schmidtke's affidavit lacked credibility, especially in light of her inability to remember any details of the communication during her testimony. "We give deference to the commission's credibility determinations because the commissioners hear live testimony and personally observe the demeanor of the respondent and the witnesses." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Santiago*, 869 N.W.2d 172, 180 (Iowa 2015). The commission found that the phone calls between Stoller and Schmidtke were not about the pending

---

[7]The actual language of Schmidtke's affidavit states that Stoller called her on May 10 and "a few days later." However, by the time the Board filed its complaint against Stoller, it established that May 15 was the date of the second telephone call.

litigation, but rather they were for the purpose of obtaining financial records so delinquent tax returns could be prepared and filed. Accordingly, we agree with the decision of the commission and hold that the Board did not prove by a convincing preponderance of the evidence that Stoller violated rule 32:4.2(a).

3. *Rule 32:8.4(c) violation—conduct involving dishonesty, fraud, deceit, or misrepresentation.* Rule 32:8.4(c) provides that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c). We have found a violation of this rule for a wide range of behavior; however, in all cases where a violation of this rule is alleged, we "require a reasonable level of scienter to find an attorney violated rule 32:8.4(c)." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Qualley*, 828 N.W.2d 282, 292 (Iowa 2013). Negligent behavior alone does not violate the rule, nor does incompetence. *Id.* at 293. "In the legal sense, a misrepresentation usually requires something more than negligence." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 587 (Iowa 2011) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Netti*, 797 N.W.2d 591, 605 (Iowa 2011)). We take violations of rule 32:8.4(c) seriously because "[h]onesty is necessary for the legal profession to function." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Haskovec*, 869 N.W.2d 554, 560 (Iowa 2015). When we determine whether an attorney has violated the rule, "the key question we must answer is whether the effect of the lawyer's conduct is to mislead rather than to inform." *Id.*

> Unlike matters relating to competency, diligence, and the like, intentional dishonest conduct is closely entwined with the most important matters of basic character to such a degree as to make intentional dishonest conduct by a lawyer almost beyond excuse. The term "dishonesty," as used in a rule of professional conduct regarding engaging in conduct

> involving dishonesty, while encompassing fraud, deceit, and misrepresentation, also includes conduct evincing a lack of honesty, probity, or integrity in principle or a lack of fairness and straightforwardness. It has been said that for purposes of attorney discipline, offenses against common honesty should be clear even to the youngest lawyers; and to distinguished practitioners, their grievousness should be even clearer.

7A C.J.S. *Attorney & Client* § 103, at 24 (2015).

In the replevin action, the district court characterized the entire transaction orchestrated by Stoller between the Martens, Chaplin, and OCI as a sham. Our code gives a landlord a lien on the personal property left on the premises for unpaid rent but does not allow a landlord to engage in the type of transaction that occurred here. *See* Iowa Code § 570.1(1) (2015). We agree with the commission that Stoller's excuse that he made a mistake in interpreting the statute lacked credibility.

At the time that the premises were abandoned by OCI, Stoller must have known that Chaplin was no longer an officer of OCI. Stoller and Chaplin had been acquaintances for a number of years. Chaplin testified that she typed her termination letter on her home computer and gave it to Stoller to send to Dahl and Schmidtke. Stoller denies any knowledge of such a letter. However, Stoller knew that Chaplin was no longer working for OCI or acting on its behalf. While Chaplin remained the registered agent for OCI in the Secretary of State's records at the time that the premises were abandoned, the only legal authority a registered agent has is to receive process. *See id.* § 490.504(1). Additionally, even if Chaplin retained an ownership interest in OCI, Stoller must have known that Chaplin did not have the authority to transfer all of the corporate assets of OCI to the Martens. Our law provides that a landlord's lien must be enforced by the commencement of a lawsuit. *Id.*

§ 570.5. Our law also provides that the disposition of operational assets—such as the equipment here—falls outside the ordinary course of business and requires the approval of the corporation's shareholders and not simply its agent. *Id.* § 490.1202(1). These actions went beyond merely misunderstanding or misconstruing a statute. As an experienced attorney, Stoller knew or should have known that the transaction he recommended did not comply with Iowa law.

The timing of the entire transaction is also an important aspect of our analysis. On March 29, the "Notice of Retention" was mailed to Chaplin as the registered agent for OCI. As part of the notice, OCI was provided twenty days to object to the Martens taking ownership of the assets. However, by the next day, Stoller had already prepared and had Chaplin execute on behalf of OCI a consent providing the Martens with sole ownership of the assets of OCI. At that time, Chaplin was also in negotiation with the Martens, through Stoller, for a lease of the same premises for the same rent. However, the new lease also included the OCI assets now "owned" by the Martens. By April 4, Stoller was contacted by Troy Dahl as president of OCI demanding the return of the corporate assets. By April 6, Stoller had incorporated Chaplin's, Inc., which had presumably formally entered into the new lease.[8] Counsel for OCI had by this point also contacted Stoller on numerous occasions.

Stoller was alerted to the fact that there was no basis in the law for his actions. Counsel for OCI sent Stoller an email alerting him that he had "no statutory basis to convert [OCI's] property without court approval." Counsel sent another email alerting Stoller that there was no

---

[8]While this lease was to be provided during the course of the several resulting lawsuits, it is not part of the record.

statutory basis for the action taken, to which Stoller replied, "I don't need your thoughts on the law." Stoller's actions throughout the OCI matter demonstrate that, rather than admitting that his actions were wrong, he dug his heels in at every turn. Even more alarming, Stoller caused harm to his clients by doing so. Although he had no good faith basis for advising them to act in this manner, he represented to the Martens and to Chaplin that it was proper. Stoller's actions ultimately caused harm to his clients and to OCI, resulting in several court proceedings and thousands of dollars in attorney fees. Even during his hearing in front of the commission, Stoller attempted to minimize his conduct by characterizing it as simply misconstruing the abandonment statute.

Stoller's actions rise to a level beyond mere incompetence or negligence. When we are asked to determine whether an attorney's actions demonstrate the level of scienter required to find a rule violation, we ask if the attorney's actions evince the intent to mislead rather than inform. *See Haskovec*, 869 N.W.2d at 560. One of the ways an attorney may do so is to fail to disclose a material fact. *Id.* Another way an attorney may demonstrate scienter is to knowingly assist a client with a fraudulent (or "sham") transaction. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ouderkirk*, 845 N.W.2d 31, 41 (Iowa 2014). We have previously found that a sham transaction violated our rules because it "involve[d] a misrepresentation of material fact spread upon and perpetuated upon the public record." *Id.* (quoting *Comm. on Prof'l Ethics & Conduct v. Jacobsen*, 511 N.W.2d 611, 616 (Iowa 1994)).

Stoller perpetrated a sham transaction that demonstrated a lack of honesty. He arranged for one client, who did not have authority to do so, to purport to sell property to another client for far less than the property's value. From the very beginning, his actions demonstrated

more than a misreading of Iowa law. His actions demonstrated the intent to mislead not only OCI but also his own clients. Stoller not only assisted Chaplin in transferring the remaining assets of OCI for far less than the equipment was worth, he also assisted her in creating a new entity and allowed her entity to take possession of the equipment to operate her own bar and restaurant. Throughout, Stoller continued to represent to Chaplin and the Martens that there was legal authority to support his actions.

Stoller's actions also demonstrated the intent to mislead OCI's real principals. As noted above, the timing of the various notices, the lease, and the incorporation of Chaplin's, Inc. demonstrates Stoller's intent to mislead OCI. Although the original "Notice of Retention" provided OCI with twenty days to act, Stoller prepared a document the very next day that conveyed the remaining OCI assets to the Martens. Further, Stoller's sham transaction resulted in multiple court proceedings and thousands of dollars in attorney fees. Stoller's advice landed his clients in front of the court for a replevin hearing and embroiled in a lawsuit with OCI.

Stoller's conduct in the OCI matter does not demonstrate the honesty in legal dealings that our rules require of Iowa attorneys. We find that the Board proved by a convincing preponderance of the evidence that Stoller violated rule 32:8.4(c).

**B. Zylstra Rules Violations.** The Board alleged that Stoller violated rules 32:1.7(a)(2), 32:1.7(b)(4), 32:1.9(a), 32:1.9(c), and 32:8.4(c) in the Zylstra matter. The commission found that Stoller violated rules 32:1.7(a)(2), 32:1.7(b)(4), and 32:1.9(a). On our de novo review, we assess each rule in turn.

1. *Rule 32:1.7 violation—conflict of interest.* As noted above, Rule 32:1.7(a) provides that an attorney cannot represent a client if there is a concurrent conflict of interest. Iowa R. Prof'l Conduct 32:1.7(a). There are two ways an attorney can violate rule 32:1.7(a), but the commission found that Stoller violated subsection (a)(2), which provides that a concurrent conflict of interest exists when "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by a personal interest of the lawyer." *Id.* r. 32:1.7(a)(2). The comments to the rule state,

> Loyalty and independent judgment are essential elements in the lawyer's relationship to a client. Concurrent conflicts of interest can arise from the lawyer's responsibilities to another client, a former client or a third person, or from the lawyer's own interests.

*Id.* r. 32:1.7 cmt. 1. The comments further state that there are four steps a lawyer must take if a conflict of interest exists. The attorney must

> 1) clearly identify the client or clients; 2) determine whether a conflict of interest exists; 3) decide whether the representation may be undertaken despite the existence of a conflict, i.e., whether the conflict is consentable; and 4) if so, consult with the clients affected.

*Id.* r. 32:1.7 cmt. 2. In today's companion case, we found that Stoller was still representing the Zylstras at the time he began his representation of NuStar.[9] *NuStar*, ____ N.W.2d at ____. We continue our analysis with the assumption that the Zylstras could qualify as either "another client" or a "former client" under subsection (a)(2).

---

[9]In *NuStar Farms*, we concluded that there was a concurrent conflict of interest under rule 32:1.7(a)(1) rather than 32:1.7(a)(2). ___ N.W.2d at ____.

First, we must clearly identify the clients. The clients involved are NuStar and the Zylstras. Second, we must determine whether a conflict of interest exists. In the companion case, we held that a conflict existed because the position of NuStar at the time Stoller undertook their representation was directly adverse to that of the Zylstras. This was, in part, because rule 32:1.7(a)(1) "applies where *directly* adverse representation *will* take place, as when one current client is about to file suit against another current client." 1 Geoffrey C. Hazard, Jr. & W. William Hodes, *The Law of Lawyering* § 11.8, at 11-22 (3d ed. 2004 Supp.); *accord Bottoms v. Stapleton*, 706 N.W.2d 411, 416 (Iowa 2005). However, in this disciplinary case, the Board charged and the commission found a violation of rule 32:1.7(a)(2). Thus, we must analyze whether Stoller's representation of NuStar was materially limited by his representation of the Zylstras.

The comments to the rule expand on the definition of materially limited:

> Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests. . . . The conflict in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself require disclosure and consent. The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.

Iowa R. Prof'l Conduct 32:1.7 cmt. 8. Stated another way, a lawyer's representation is materially limited "when a danger of divided loyalties

burdens or impedes" the attorney's strategy. *McKinley*, 860 N.W.2d at 882.

Stoller began his representation of NuStar in early May, knowing that the action would eventually become adverse to the Zylstras if they refused to sign the deed. Stoller began contacting the Zylstras on behalf of NuStar before the May 13 email officially terminating the attorney–client relationship. By the time Stoller sent the May 13 email, he was already contemplating taking action against the Zylstras on behalf of NuStar. His email to the Zylstras stated,

> I must now put you on formal notice that if the signed deed is not received by my office by the close of business on Wednesday, May 14, 2014, that I will need to pursue the appropriate remedies for specific performance and damages on behalf of Nustar.

In this email, Stoller clearly evinces the intent to pursue a future adverse action against the Zylstras. The intent to pursue legal action unless the Zylstras complied with NuStar's request to sign the deed arose before the email was sent. Stoller and NuStar had already discussed the possibility of taking action, which is precisely why the demand, or "formal notice" language, is included in the email. Until the Zylstras received the May 13 email, Stoller continued to represent them in their small claims action. In the same email terminating the attorney–client relationship, Stoller threatened to bring a civil suit against the Zylstras on a legal matter that he had previously discussed with Robert.

Rule 32:1.7 provides a method for a lawyer to avoid a concurrent conflict of interest. Iowa R. Prof'l Conduct 32:1.7(b). A lawyer may continue to represent a client even when there is a concurrent conflict of interest if "each affected client gives informed consent, confirmed in writing." *Id.* r. 32:1.7(b)(4).

As discussed above, we find that there was a conflict of interest in Stoller's representation of NuStar and the Zylstras. Because of this conflict, Stoller was required to obtain informed, written consent from both parties. In his May 13 email, Stoller states that he had orally advised both NuStar and the Zylstras about the conflict and that he could not represent either party. However, there is nothing in the record to indicate that Stoller ever obtained written consent from either party. We therefore find that the Board proved by a convincing preponderance of the evidence that Stoller's representation of NuStar is a conflict of interest under rule 32:1.7(a)(2).

2. *Rule 32:1.9(a) violation—continuing duty to former clients in the same or substantially related matter.*

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

*Id.* r. 32:1.9(a). In our companion case, we found that Stoller did not violate this rule. *NuStar*, ___ N.W.2d at ___.

The comments explain what makes a matter substantially related for purposes of the rule. Iowa R. Prof'l Conduct 32:1.9 cmt. 3. A matter is substantially related if there is "a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter." *Id.* A matter is also substantially related if it involves the same transaction or legal dispute. *Id.* When we are asked to determine whether a substantial relationship exists, we consider three factors:

> (1) the nature and scope of the prior representation; (2) the nature of the present lawsuit; and (3) whether the client might have disclosed a confidence to [his or] her attorney in the prior representation which could be relevant to the present action.

*Doe v. Perry Cmty. Sch. Dist.*, 650 N.W.2d 594, 598 (Iowa 2002).

Under the first factor, we must determine the scope of Stoller's representation of the Zylstras in regard to the manure easement agreements. There is no question that Stoller and Robert met to discuss the agreements, nor is there a question that Stoller knew Robert intended to enter into the agreements with NuStar. Both parties acknowledge that Robert showed Stoller the agreements during the meeting. Stoller acknowledges that he looked at the first page of the agreements and made some notations, though he states that the notations were made at Robert's request and for the purpose of consulting with another attorney. Stoller contends that he did not read past the first page of the agreements. Stoller also recommended that Robert seek the advice of another attorney and gave him the names of two attorneys to contact. Following the meeting, Stoller sent Robert an email that stated Stoller had "briefly looked at" the agreements and that Robert should run the changes he wanted by another attorney. The email reflects at least some level of advice given to Robert by Stoller. However, it is in stark contrast to our prior cases where we have found a rule 32:1.9 violation.

In *Doe*, we found that an attorney was involved in a client's prior representation when the attorney had met with the clients, had telephone conversations with the clients, appeared as their attorney in court, and signed pleadings on their behalf. *Id.* at 599. In *Iowa Supreme Court Attorney Disciplinary Board v. Marks*, we found a violation of rule 32:1.9(a) when the attorney represented a client in a foreclosure action

and then later represented his own wife in drafting a contract dictating the sale of property to that former client. 814 N.W.2d 532, 539 (Iowa 2012). We found that the actions were substantially related because the attorney had obtained information about the client's property during the foreclosure action and the foreclosure action itself concerned the client's home and property. *Id.* In comparison, we cannot say that the scope of Stoller's representation, if any, was significant in regard to the manure easement agreements.

The second factor we consider is the nature of the lawsuit between the Zylstras and NuStar. *Doe,* 650 N.W.2d at 598. In the original petition Stoller filed on behalf of NuStar, there were six counts. All of the counts except for one deal with a real estate contract between NuStar and the Zylstras that Stoller did not participate in drafting. There is one count in the petition that alleges a breach of the manure easement agreements between NuStar and the Zylstras. Although the majority of the counts do not relate to the manure easement agreements that Stoller had prior knowledge of, at least one count does.

The last factor we consider is "whether the client might have disclosed a confidence to [his or] her attorney in the prior representation which could be relevant to the present action." *Id.* The meeting between Robert and Stoller to discuss the agreements was brief, and the parties only superficially discussed the contents of the agreements. The meeting concluded with Stoller recommending that the agreements be finalized only after consulting with attorneys more experienced in agricultural law. Nothing from the meeting indicates that Robert disclosed any confidential information to Stoller concerning the agreements that would affect the current lawsuit.

We find that the Board did not prove by a convincing preponderance of the evidence that Stoller violated rule 32:1.9(a).

3. *Rule 32:1.9(c) violation—using information revealed by a former client.*

> A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:
>
> (1) use information relating to the representation to the disadvantage of the former client except as these rules would permit or require with respect to a client, or when the information has become generally known; or
>
> (2) reveal information relating to the representation except as these rules would permit or require with respect to a client.

Iowa R. Prof'l Conduct 32:1.9(c).

The record does not demonstrate that Stoller used or revealed any information he obtained in his meeting with Robert regarding the manure easement agreements during his representation of NuStar. Stoller's meeting with Robert was brief and, at most, involved a cursory review of the multipage manure easement agreements. Stoller did not represent the Zylstras in drafting or executing the agreements. In fact, Stoller referred Robert to two other attorneys for representation regarding the easements. We agree with the commission that the Board did not prove a violation of rule 32:1.9(c) by a convincing preponderance of the evidence.

4. *Rule 32:8.4(c) violation—conduct involving dishonesty, fraud, deceit, or misrepresentation.* It is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit, or misrepresentation." *Id.* r. 32:8.4(c). In order to find a violation of this rule, we "require a reasonable level of scienter." *Qualley*, 828 N.W.2d at

292. Negligent or incompetent behavior does not suffice to demonstrate a violation of the rule. *Id.* at 293.

While we found a concurrent conflict of interest between Stoller and the Zylstras in violation of rule 32:1.7, we do not believe that Stoller's actions rise to the level of "dishonesty, fraud, deceit, or misrepresentation." Iowa R. Prof'l Conduct 32:8.4(c). In his May 13 email to the Zylstras, Stoller stated, "I have tried to remain neutral in those matters and advised each party that I could represent neither." He later testified that he originally thought there was a conflict but, after reflecting on the rules, concluded there was no conflict because he severed the attorney–client relationship before filing a petition on behalf of NuStar. While we conclude Stoller was wrong, there is nothing in this record to suggest any dishonesty, fraud, or deceit by his actions. We find that his actions involve mere negligence, or perhaps an incorrect interpretation of our rules. There is no reasonable level of scienter here. The commission thought that Stoller was parsing the rules rather than adhering to the spirit of the rules in the Zylstra matter. While that may be true, we do not believe that his actions violate rule 32:8.4(c). We find that the Board did not prove a violation of rule 32:8.4(c) in the Zylstra matter by a convincing preponderance of the evidence.

**C. Sanctions.** Although our prior cases are instructive when determining an appropriate sanction, "[t]here is no standard sanction for [any] particular type of misconduct." *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Blessum*, 861 N.W.2d 575, 591 (Iowa 2015) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Morris*, 847 N.W.2d 428, 435 (Iowa 2014)). Instead, we "determine an appropriate sanction based on the particular circumstances of each case." *Morris*, 847 N.W.2d at 435 (quoting *Iowa*

*Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 729 N.W.2d 437, 443 (Iowa 2007)).

> When crafting a sanction, we consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances.

*Blessum*, 861 N.W.2d at 591 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Clarity*, 838 N.W.2d 648, 660 (Iowa 2013)). While we seek to "achieve consistency with prior cases when determining the proper sanction," it is rare that we encounter cases with the exact same conduct. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McGinness*, 844 N.W.2d 456, 464 (Iowa 2014) (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Templeton*, 784 N.W.2d 761, 769 (Iowa 2010)).

The commission recommended a public reprimand for the rule 32:1.7(a)(2) violation and a three-month suspension for the rule 32:8.4(c) violation in the OCI matter. The commission recommended a concurrent three-month suspension for the three rule violations in the Zylstra matter. We generally do not impose concurrent suspensions. In the past, we have imposed a concurrent suspension when we found a rule violation and while the attorney was still suspended from practicing law, another prior rule violation was brought to our attention. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Moorman*, 729 N.W.2d 801, 805–06 (Iowa 2007). This is not the situation we are presented with in this case.

1. *Range of sanctions in prior cases.* We find that Stoller violated rules 32:1.7 and 32:8.4(c) in the OCI matter. We also find that Stoller violated rule 32:1.7 in the Zylstra matter.

We have imposed a range of sanctions for violations of rule 32:1.7. Our sanctions have ranged between a public reprimand and a two-year

license suspension. The majority of sanctions imposed have been either a sixty-day suspension or a four-month suspension. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Mendez*, 855 N.W.2d 156, 173–75 (Iowa 2014) (imposing a sixty-day sanction for multiple rule violations including trust account violations for forty-three clients); *Qualley*, 828 N.W.2d at 294 (imposing a sixty-day suspension for the violation of four rules of professional conduct); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Yang*, 821 N.W.2d 425, 430–31 (Iowa 2012) (imposing a public reprimand for the violation of rules 32:1.4, 1.7, and 8.4); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Zenor*, 707 N.W.2d 176, 181, 187 (Iowa 2005) (imposing a four-month suspension when the conflict of interest involved prosecuting persons who were clients). Sanctions above sixty days have generally been for more severe violations and in cases where multiple violations have occurred. *See, e.g., Netti*, 797 N.W.2d at 606–07 (imposing a two-year suspension for multiple rule violations of a "serious, egregious, and persistent nature").

Generally, we have suspended the licenses of attorneys who violate rule 32:8.4(c). Many of our cases where we have found a rule 32:8.4(c) violation involve the misappropriation of client funds. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Cepican*, 861 N.W.2d 841, 844 (Iowa 2015). When attorneys misappropriate client funds with no colorable future claim, the sanction we normally impose is license revocation. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Carter*, 847 N.W.2d 228, 234 (Iowa 2014). Those cases are not instructive for this situation.

We also have a number of cases where attorneys have made misrepresentations about their accounting on their yearly client security questionnaires. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kersenbrock*, 821 N.W.2d 415, 417–18 (Iowa 2012). These cases

necessarily include trust fund violations, but the attorneys have a colorable future claim to the funds. *Carter*, 847 N.W.2d at 232. The violations occur because the attorneys have made misrepresentations intended to mislead the Client Security Commission. *Kersenbrock*, 821 N.W.2d at 421. We have imposed a range of sanctions depending on the severity of the attorney's conduct. In *Iowa Supreme Court Attorney Disciplinary Board v. Nelissen*, the attorney made one misrepresentation on her client security report in 2014 but also had one prior trust account violation. 871 N.W.2d 694, 700–01 (Iowa 2015). We imposed a thirty-day suspension. *Id.* at 702. However, in *Cross*, the attorney submitted misleading client security questionnaires each year from 2009 through 2012. 861 N.W.2d at 221. He also failed to maintain ledgers, failed to perform reconciliations, did not keep client funds separate from personal funds, and overdrew his trust account on at least four occasions. *Id.* Cross also engaged in tax violations and was not cooperative with the Board. *Id.* at 225. We determined a one-year suspension was appropriate. *Id.* at 230.

We have also imposed an array of sanctions for violations of rule 32:8.4(c) that do not involve trust account violations. In *Haskovec*, the attorney had a witness to a will sign the will outside the presence of the testator and the other witness, although he knew the witness needed to sign in their presence for the will to be valid. 869 N.W.2d at 561. He did not disclose to the witness that the will would not be valid. *Id.* Because of his advice to the witness to sign the will outside the presence of the testator and other witness, Haskovec knew that the document included a false statement. *Id.* We found that his conduct "had the effect to mislead rather than to inform." *Id.* Because he had no prior disciplinary record, he immediately disclosed his actions, and the disclosure came

before it caused harm to the courts or to the public, we determined that a public reprimand was appropriate. *Id.* at 562.

In *Iowa Supreme Court Attorney Disciplinary Board v. Van Ginkel*, an attorney filed an interlocutory report with the court that included false statements. 809 N.W.2d 96, 107 (Iowa 2012). The report falsely stated that a tax return for an estate was filed and that Van Ginkel was waiting on the income tax acquittance. *Id.* However, he had not yet filed the Iowa estate income tax return. *Id.* Based on this violation, in conjunction with others, we determined a two-month suspension was appropriate. *Id.* at 110–11.

In *McGinness*, we found a violation of rule 32:8.4(c) when an attorney repeatedly made misrepresentations of material fact to his opposing counsel. *McGinness*, 844 N.W.2d at 462. Although he had not complied with discovery requests, McGinness photocopied old certificates of service and sent them to opposing counsel to make it appear as though he had timely served the discovery requests. *Id.* When confronted, McGinness continued to lie to opposing counsel. *Id.* In determining the appropriate sanction, we noted that McGinness made multiple misrepresentations over a period of time and continued to attempt to justify his falsehoods. *Id.* at 466. We determined a six-month suspension was appropriate. *Id.* at 467. The majority of our six-month suspensions involve additional rule violations beyond rule 32:8.4(c). *See, e.g., id.* at 465–66.

2. *Aggravating and mitigating factors.* We also must consider any mitigating or aggravating factors when we determine what the appropriate sanction is for the violation of our rules. *See id.* at 463.

Stoller testified during his hearing about his personal and mental health issues, how they affected him in the past, his treatment, and how

he was attempting to scale back his practice due to his health concerns. However, he requested that the commission not treat his health as a mitigating factor for the purpose of sanctions. Stoller testified that his depressive disorder caused him to respond to some of the Board inquiries in a more aggressive manner than he would have liked. Similarly, the commission noted that this combative behavior was pervasive throughout his interactions not only with the Board but also with opposing counsel—notably, the attorney who represented OCI in the action against Chaplin, the Martens, and eventually, Stoller himself. However, we have generally recognized that, when an attorney refuses to attribute conduct to his or her underlying mental health, we will decline to treat it as a mitigating factor. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Silich*, 872 N.W.2d 181, 192 (Iowa 2015).

Stoller testified at length regarding his personal struggle with depression, his family history of depression, and a friend's suicide. Since his friend's suicide, Stoller has been active in counseling others struggling with depression and mental illness, including other attorneys. While we have not yet addressed counseling others as a mitigating factor, we do consistently recognize seeking mental health or other substance abuse treatment as a mitigating factor. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kingery*, 871 N.W.2d 109, 122–23 (Iowa 2015); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Kieffer-Garrison*, 847 N.W.2d 489, 496 (Iowa 2014). We also recognize community service, volunteer work, and pro bono practice as mitigating factors. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Boles*, 808 N.W.2d 431, 442 (Iowa 2012). We find this to be similar, and consider Stoller's work in counseling as a mitigating factor.

Stoller received a public reprimand in 2006 for conduct unrelated to the circumstances of this case. He has had no other discipline imposed since the past misconduct. While we generally consider a previous public reprimand an aggravating factor, we give it little weight when the previous discipline is unrelated to the current misconduct and a number of years have passed since the sanction was imposed. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Johnston*, 732 N.W.2d 448, 456 (Iowa 2007). Another aggravating factor in this case is that Stoller is an experienced attorney who has been practicing for 35 years. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bartley*, 860 N.W.2d 331, 339 (Iowa 2015).

Further, a number of clients were harmed by Stoller's conduct, resulting in multiple court proceedings and the expenditure of thousands of dollars in legal fees. Notably, the Martens and Chaplin were embroiled in two lawsuits with OCI that could have been avoided had Stoller given appropriate advice on how to handle OCI's abandonment of the premises and the handling of the restaurant equipment. When an attorney's rule violations result in harm to clients, we consider that an aggravating factor when crafting an appropriate sanction. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Adams*, 749 N.W.2d 666, 670 (Iowa 2008).

Considering the previous sanctions we have imposed for violations of the same rules and considering all of the mitigating and aggravating factors in this case, we find that a sixty-day suspension is appropriate.

3. *Firearm recommendation.* The commission also recommended that Stoller be prohibited from possessing a firearm while conducting any legal business as a condition of his reinstatement. The commission made this decision despite the fact that the Board never requested a firearm sanction. Robert's letter to the Board came in the middle of

these proceedings. Stoller was given no notice that the commission would consider restrictions on firearms as part of his disciplinary proceeding. The "absence of fair notice as to the reach of the grievance procedure and the precise nature of the charges deprive[s] [a] petitioner of procedural due process." *In re Ruffalo*, 390 U.S. 544, 552, 88 S. Ct. 1222, 1226, 20 L. Ed. 2d 117, 123 (1968). While the allegation, if true, is disturbing, we decline to adopt the recommendation of the commission as to the possession of a firearm.

## IV. Disposition.

For the above reasons, we suspend Stoller's license to practice law with no possibility of reinstatement for sixty days from the filing of this opinion. This suspension shall apply to all facets of the practice of law. *See* Iowa Ct. R. 34.23(3). Stoller must comply with the notification requirements of Iowa Court Rule 34.24. Costs are assessed against Stoller pursuant to Iowa Court Rule 36.24(1). Unless the Board objects, Stoller shall be automatically reinstated after the sixty-day suspension period on condition that all costs have been paid. *See id.* r. 34.23(2).

**LICENSE SUSPENDED.**